**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STAND UP FOR CALIFORNIA!, ET AL.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.<br><br>Defendants. | **CASE NO. 2:16-CV-02681-AWI-EPG**<br><br>**ORDER DENYING STAND UP FOR CALIFORNIA!'S MOTION FOR SUMMARY JUDGMENT**<br>(Doc. 29)<br><br>**ORDER GRANTING NORTH FORK'S MOTION FOR SUMMARY JUDGMENT**<br>(Doc. 36)<br><br>**ORDER GRANTING THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**<br>(Doc. 40)<br><br>**ORDER DENYING MOTION TO STAY**<br>(Doc. 28) |

**I. Introduction**

Plaintiffs Stand Up for California!, Randall Brannon, Madera Ministerial Association, Susan Stjerne, First Assembly of God – Madera, and Dennis Sylvester (collectively "Stand Up") have brought this action against the Department of the Interior, and its Bureau of Indian Affairs and the heads of both (collectively the "Federal Defendants" or "United States"), seeking to prevent class III gaming activity by the North Fork Rancheria of Mono Indians at a 305.49 acre parcel of land in Madera, California ("the Madera Parcel"). *See* Doc. 13. The Court permitted

North Fork Rancheria of Mono Indians ("North Fork") to intervene in this action. Doc. 23.

The parties have filed cross-motions for summary judgment in accordance with the briefing schedule approved by the Court. Docs. 23, 29, 36, 40. Plaintiff Stand Up has also filed a motion to stay the proceedings until the California Supreme Court can resolve whether the Governor of the State of California had the authority under California law to concur in the Secretary of the Interior's two-part after acquired lands determination. Doc. 28; *see* 25 U.S.C. § 2917(b)(1)(A). For the following reasons, Plaintiff's motions will be denied and Defendants' motions will be granted.

## II. Background

**A. North Fork Tribe and Acquisition of Proposed Gaming Site**

The North Fork Rancheria of Mono Indians is a federally recognized Indian tribe, located in Madera County. North Fork's Separate Statement of Undisputed Facts, Doc. 38 ("Doc. 38") at ¶ 1. Presently, "North Fork has no source of revenue other than federal grants and California Revenue Sharing Trust Fund distributions…." Doc. 38 at ¶ 2. North Fork possesses a 61.5 acre parcel in North Fork, California, held in trust by the United States as a reservation. *See* Doc. 38 at ¶ 2; Administrative Record ("AR") at 00000248.[1] That land is "not suitable for commercial development." Doc. 38 at ¶ 2.

In 2005, North Fork submitted a fee-to-trust application to the United States Department of the Interior, seeking to have a roughly 305-acre parcel of land in Madera, California, (the "Madera Site") taken into trust for purposes of developing a hotel and casino. Doc. 38 at ¶ 3; AR00000160. In 2006, North Fork submitted a supplement to its fee-to-trust application, also asking the Secretary of the Interior conduct a two-part determination[2] pursuant to 25 U.S.C. § 2917(b)(1)(A), excepting the Madera Parcel from the prohibition on gaming on lands acquired in trust for an Indian tribe after October 17, 1988. *See* Doc. 38 at ¶ 4; AR00000240.

---

[1] Due to the size of the administrative record, it was lodged in paper and compact disc formats. *See* Doc. 26. It is not available on the Court's cm/ecf system.

[2] The two-part determination of § 2719(b)(1)(A) provides an exception to the general prohibition on class III gaming on lands acquired after October 17, 1988, by asking if gaming on the newly acquired lands is in the best interest of the Indian tribe and its members, and if such gaming would be non-detrimental to the surrounding community. The two-part determination requires an affirmative finding on both questions by the Secretary of the Interior and concurrence by the Governor of the State in which the gaming activity is to be conducted.

A lengthy review process followed. Significant for this action, the Department of the Interior conducted an environmental impact study ("EIS") to address the environmental impact of operation of a hotel and casino on the Madera Site. *See* Doc. 38 at ¶ 6; *North Fork Rancheria of Mono Indians v. State of California* ("*North Fork v. California*"), 2015 WL 11438206, *1 (E.D. Cal. Nov. 13, 2015). The results of the EIS were published on August 6, 2010. AR00000160; *Picayune Rancheria of Chukchansi Indians v. United States Dept. of the Interior* ("*Picayune v. DOI*"), 2017 WL 3581735, *1 (E.D. Cal. Aug. 18, 2017); *North Fork v. California*, 2015 WL 11438206 at *1; *see* Doc. 38 at ¶ 6.[3] The DOI also conducted a conformity determination pursuant to the Clean Air Act with respect to the fee-to-trust determination. *See* Doc. 29-4 at 104-137.

The Secretary did not conduct any other EIS, environmental assessment, or conformity determination with respect to the Madera Site prior to prescribing of gaming procedures.

**B. Related Actions**

*1. Good Faith Litigation*

On March 17, 2015, North Fork initiated an action against the State of California to compel the state to negotiate a new tribal-state compact in good faith. *North Fork Rancheria of Mono Indians of California v. State of California*, E.D.C.A. No. 1:15-cv-419-AWI-SAB, Doc. 1 (E.D. Cal. Mar. 17, 2015). On November 13, 2015, this Court granted North Fork's motion for judgment on the pleadings and ordered North Fork and California to conclude a compact for the Madera Site within sixty (60) days. *North Fork v. California*, 2015 WL 11438206 (E.D. Cal. Nov. 13, 2015)[4]; 25 U.S.C. § 2710(d)(7)(A), (d)(7)(B). North Fork and California were unable to negotiate and conclude a compact within the 60-day period. *North Fork v. California*, Doc. 27 at 1 (E.D. Cal. Jan 15, 2016). This Court appointed a mediator, directed the parties to submit their last best offers for a compact to the mediator, and directed the mediator to "select from the two proposed compacts the one which best comports with the terms of [IGRA], ... any other applicable Federal law[,] and with the findings and order (Doc. 25) of th[is] [C]ourt." *Id.*, Doc.

---

[3] *See also* northforkeis.com (last accessed on July 18, 2018).
[4] The order on cross-motions for judgment on the pleadings is located at AR00000476-00000498 and AR00001366-00001388. For the sake clarity and accessibility, this Court uses the reporter citation.

30 at 1 (E.D. Cal. Jan. 26, 2016); *see* 25 U.S.C. § 2710(d)(7)(B)(iv). The mediator selected North

Fork's compact and submitted the compact to North Fork and California. AR 000000001-142;

*see* 25 U.S.C. § 2710(d)(7)(B)(v). California did not consent to the compact within 60-days of

the compact having been submitted to it. AR00000001. The mediator informed the Secretary of

the Interior that California did not consent to the selected compact. AR00000001; *see* 25 U.S.C.

§ 2710(d)(7)(B)(vii). "On July 29, 2016, the Secretary of the Interior notified North Fork and

California that it had issued Secretarial Procedures for the purpose of authorizing class III

gaming at the Madera Site." AR00002186-2325.

*2.   The District of Columbia Action*

On December 10, 2012, Stand Up for California! filed an action against the Secretary of the

Interior, bringing APA, IRA, IGRA, National Environmental Policy Act ("NEPA"), and Clean

Air Act ("CAA") challenges to the Secretary's two-part, fee-to-trust, and environmental impact

determinations regarding proposed gaming at the Madera Site. *Stand Up for California! v. Dept.*

*of the Interior*, No. 1:12-cv-2039-BAH, Doc. 1 (D.D.C. Dec. 10, 2012); *see also Id.*, Stand Up's

Third Amended Complaint, Doc. 103 (Dec. 3, 2014). On December 31, 2012, Picayune filed a

similar action against the Secretary regarding the Madera Site. *See Picayune Rancheria of the*

*Chukchansi Indians v. United States*, No. 1:12-cv-2071-BAH, Doc. 1 (D.D.C. Dec. 31, 2012). In

that action, Picayune alleged, among other things, that the "Assistant Secretary [of the Interior]

violated the APA, IGRA, and the IRA by relying on a purported concurrence from the Governor

of California that is ultra vires and invalid under California law." *Id.*, Doc. 1 at ¶ 57.

On January 9, 2013, the District of Columbia district court consolidated the *Stand Up* and

*Picayune* actions. *Stand Up for California! v. Dept. of the Interior*, 1:12-cv-2039-BAH, Minute

Entry (Jan. 9, 2013). The parties filed cross-motions for summary judgment in early 2015. *Id.*,

Docs. 106, 108, 111-117, 121, 122. The District of Columbia district court ordered additional

briefing on the question of whether the State of California was required to be joined under

Federal Rule of Civil Procedure 19. *Id.*, Doc. 135 (Sept. 30, 2015).

While the cross-motions for summary judgment were under submission, the Secretary

"prescribed the secretarial procedures mandated by IGRA," as a result of the Good Faith

Negotiation Action before this Court. *Id.*, Docs. 163, 163-1; *Stand Up for California! v. Dept. of the Interior*, 204 F.Supp.3d 212, 240 (D.D.C. 2016) ("On July 29, 2016, Lawrence S. Roberts, Acting Assistant Secretary of Indian Affairs, notified the North Fork Tribe and the State of California that, after reviewing the mediator's compact submission, 'procedures under which the [North Fork Tribe] may conduct Class III gaming consistent with IGRA' had been issued and, thus, 'Secretarial Procedures for the conduct of Class III gaming on the Tribe's Indian lands are prescribed and in effect.'") (citation omitted, alteration in original).

On September 6, 2016, United States District Court for the District of Columbia dismissed Picayune and Stand Up's claims premised on the invalidity of the Governor's concurrence, concluding that the State of California was an indispensable party. *Stand Up for California! v. Dept. of the Interior*, 204 F.Supp.3d at 253-254. The court further dismissed the claims premised upon the invalidity of the 2012 Compact as moot in light of the issuance of Secretarial procedures. *See Id*. at 248. As to all other of Picayune and Stand Up's IGRA, IRA, APA, NEPA, and CAA claims, the court granted summary judgment in favor of the Secretary and North Fork. *Id.* at 323.

Stand Up and Picayune appealed a portion of the district court's judgment to the circuit court level. *Stand Up for California! v. Dept. of the Interior*, ---F.3d----, 2018 WL 385220 (D.C. Cir. Jan. 18, 2018).[5] The United States Court of Appeals for the District of Columbia Circuit affirmed all challenged portions of the lower court's decision. *Id.*

### 3. The Gubernatorial Concurrence Action

In March of 2013, Stand Up filed suit in the Madera County Superior Court, contending that the Governor lacked the authority under California law to concur in the Secretary of the Interior's two-part determination. *Stand Up for California v State of California et al*., 5th DCA Case No. F069302. The Madera County Superior Court held that the Governor's authority to

---

[5] Picayune challenged, but Stand Up did not challenge, the district court's determination that California is a necessary party to an action containing "any challenge to the validity of the Governor's concurrence." *Stand Up for California v. Dept. of the Interior*, 204 F.Supp.3d at 251; *Stand Up For California! v. Dept. of the Interior*, 2018 WL 385220, *6.

concur with the Secretary's determination is implicit in the Governor's authority to negotiate and conclude Tribal-State compacts on behalf of the state. *Id*. Stand Up appealed.

The Fifth District Court of Appeal issued a decision on December 16, 2016, in three separate opinions, reversing the judgment of the trial court and holding that the Governor's concurrence was invalid under state law. *Stand Up for California! v. State of California*, 6 Cal.App.5th 686 (Cal. Ct. App. Dec. 16, 2016). Several months earlier, the California Third District Court of Appeal issued a decision on a similar question regarding a different Indian tribe, determining that the Governor's concurrence with a two-part determination by the Secretary is an executive (rather than legislative) power and therefore within the authority of the Governor. *United Auburn Indian Community of Auburn Rancheria v. Brown*, 4 Cal.App.5th 36, 208 Cal.Rptr.3d 487 (Cal. Ct. App. Oct 13, 2016).

In light of the apparent disagreement, the California Supreme Court has granted review of *Stand Up for California! v. State of California* and *United Auburn. See Stand Up for California! v. State of California*, 390 P.3d 781 (Mar. 22, 2017) (granting review and deferring consideration pending resolution of *United Auburn*); *United Auburn*, 387 P.3d 741 (Jan. 25, 2017) (granting review). Both actions remain pending.

## III. Legal Standard

A. IGRA, Johnson Act, NEPA, and CAA claims brought pursuant to the APA

Summary judgment is an appropriate mechanism for reviewing agency decisions under the APA. *Turtle Island Restoration Network v. United States Dept. of Commerce*, 878 F.3d 727, 732 (9th Cir. 2017); *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir.1997); *Occidental Engineering Co. v. Immigration & Naturalization Service*, 753 F.2d 766, 769–70 (9th Cir.1985). However, courts do not utilize the standard analysis for determining whether a genuine issue of material fact exists. *See Occidental*, 753 F.2d at 769–70; *Academy of Our Lady of Peace v. City of San Diego*, 835 F.Supp.2d 895, 902 (S.D.Cal.2011); *California RSA No. 4 v. Madera Cnty.*, 332 F.Supp.2d 1291, 1301 (E.D.Cal.2003). In reviewing an agency action, the relevant legal question for a court is "whether the agency could reasonably have found the facts as it did." San *Francisco*, 130 F.3d at 877; *Occidental*, 753 F.2d at 769. A court

"is not required to resolve any facts in a review of an administrative proceeding." *Occidental*, 753 F.2d at 769; *California RSA*, 332 F.Supp.2d at 1301. Instead, in reviewing an agency action, the relevant legal question for a court reviewing a factual determination is "whether the agency could reasonably have found the facts as it did." *San Francisco*, 130 F.3d at 877; *Occidental*, 753 F.2d at 769; *California RSA*, 332 F.Supp.2d at 1301.

The Court's review in resolving an APA challenge to an agency action is circumscribed: the court will only set aside agency action if its "'findings[] and conclusions [are] found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 'in excess of statutory jurisdiction' or 'without observance of procedure required by law." *Turtle Island*, 878 F.3d at 732 (quoting 5 U.S.C. § 706(2)(A), (C)-(D)). Agency action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Defs. Of Wildlife v. Zinke*, 856 F.3d 1248, 1256-1257 (9th Cir. 2017) (citation omitted); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (An "agency must examine the relevant data and articulate a satisfactory explanation for its action.") This standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)). Review under this standard is narrow, and the court may not substitute its judgment for that of the agency. *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 573 (9th Cir. 1988). Nevertheless, the court must "engage in a substantial inquiry ... a thorough, probing, in-depth review." *Native Ecosys. Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citation and internal quotations omitted).

B. FOIA Claim

Any party may move for summary judgment, and the Court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); *Washington Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011). A plaintiff bears the burden of proof at trial, and to prevail on summary judgment, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the plaintiff. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial or in moving for summary judgment, they need only prove an absence of evidence to support the plaintiff's case. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, *Soremekun*, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In the FOIA context, courts review an agency's decision whether or not to disclose de novo. 5 U.S.C. § 552(a)(4)(B); *see also Louis v. United States Dep't of Labor*, 419 F.3d 970, 977 (9th Cir. 2005) (De novo review "requir[es] no deference to the agency's determination or rationale regarding disclosures.") However, courts "accord substantial weight to an affidavit of

an agency concerning the agency's determination as to technical feasibility ... and reproducibility." 5 U.S.C. § 552(a)(4)(B). If the FOIA dispute presents a genuine issue of material fact, courts proceed to a bench trial or adversary hearing. *Animal Legal Def. Fund v. United States Food & Drug Admin.*, 836 F.3d 987, 990 (9th Cir. 2016).

## IV. Discussion

### A. Administrative Procedures Act ("APA") Review

Stand Up seeks APA review of the Secretary's decision to issue Secretarial Procedures regulating gaming on the Madera Site. Stand Up contends that the Secretary's issuance of gaming procedures violated the Johnson Act, 15 U.S.C. § 1171, et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq., and the Indian Gaming Regulatory Act ("IGRA").

### 1. The Johnson Act

The Johnson Act, enacted in 1951, prohibits the possession or use of "any gambling device[6] … within Indian country." 15 U.S.C. § 1175(a). Stand Up argues that IGRA provides an exception to the general prohibition on use of slot machines in Indian country *only when* a valid Tribal-State compact has been entered into to govern gaming on the Indian land. Doc. 29 at 16 (citing 25 U.S.C. § 2710(d)(6) ("The provisions of section 1175 of Title 15 shall not apply to any gaming conducted under a Tribal-State compact that (A) is entered into … by a state in which gambling devices are legal, and (B) is in effect.") It is agreed that no effective Tribal-State compact has ever been entered into by North Fork and the State of California. Indeed, that fact was the predicate for North Fork's good faith negotiation action, which ultimately resulted in the issuance of Secretarial Procedures and not a Tribal-State compact. *See North Fork v. California*, 2015 WL 11438206 at *2-3. Accordingly, Plaintiff argues that "[b]ecause North Fork … has not entered into a compact with the state that is effective under IGRA," the Johnson Act prohibits gaming "at the Madera Site." Doc. 29 at 16-17. In sum, Stand Up contends that any prescribing of Secretarial Procedures pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii)—which can only take place

---

[6] "Gaming device," for purposes of the Johnson Act, includes "slot machine[s]." 15 U.S.C. § 1171(a).

in the absence of an effective Tribal-State compact—violates the Johnson Act if those procedures permit use of slot machines.

Defendants contend that gaming under Secretarial Procedures should be considered the functional equivalent of gaming under a Tribal-State compact. Reading IGRA as a whole, they contend, makes clear that Secretarial Procedures are designed to operate as a complete substitute to existence of an effective Tribal-State compact. North Fork and the Secretary both rely on the purpose of IGRA (generally) and the purpose of the remedial process. If Stand Up's reading of the Johnson Act is accepted, they argue, the purpose of the remedial process will be thwarted and the value of Secretarial Procedures diminished.

The Court begins, as it must, by examining the text of the statutes at issue. *Friends of Animals v. United States Fish and Wildlife Service*, ---F.3d----, 2018 WL 343754, *3 (9th Cir. Jan. 10, 2018) (quoting *Limtacio v. Camacho*, 549 U.S. 483, 488 (2007)); *see Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). The Johnson Act is clear in its broad prohibition of sale, "transport[ation], possess[ion], or use [of] any [slot machine] … within Indian country." 15 U.S.C. § 1175(a). The Johnson Act provides no exceptions relevant here. Congress was not blind to the limitations imposed by the Johnson Act in enacting IGRA. It specifically carved out an exception to the prohibition imposed by the Johnson Act for "any gaming conducted under a Tribal-State compact that (a) is entered into under paragraph (3)[7] by a State in which gaming devices are legal, and (b) is in effect." 25 U.S.C. § 2710(d)(6). IGRA does not carve out the same express exception for gaming conducted pursuant to Secretarial Procedures. And, as Stand Up correctly points out, elsewhere in section 2710, Congress makes clear in an earlier step of the remedial process, a compact selected by the appointed mediator and consented to by the State "shall be treated as a Tribal-State compact entered into under paragraph (3)." 25 U.S.C. § 2710(d)(7)(B)(vi). No such language is used to describe the situation wherein the State refuses to

---

[7] 25 U.S.C. § 2710(d)(3) provides, in full, as follows:

> Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

consent to the compact selected by the mediator and the Secretary prescribes gaming procedures. 25 U.S.C. § 2710(d)(7)(B)(vi).

Section 2710(d)(6) exempts gaming conducted pursuant to a Tribal-State compact from the reach of the Johnson Act. Section 2710(d)(6) does not expressly exempt gaming conducted pursuant to Secretarial Procedures from the reach of the Johnson Act. At first blush, Secretarial Procedures issued pursuant to section 2710(d)(7)(b)(vii) do not appear to be "a Tribal-State compact" for purposes of section 2710(d)(3). The statutory language is clear and unambiguous. In such situations "the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce [the statute] according to its terms." *Dodd v. United States*, 545 U.S. 353, 359 (2005) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)). A closer look at Stand Up's proposed reading makes clear that the outcome that it proposes is absurd—it would result in internal inconsistencies within IGRA, it would render the issuance of Secretarial Procedures inoperative in every case, and it would undermine the carefully crafted statutory scheme and goals of IGRA and its remedial process.

In the situation at bar, the Secretary is compelled by IGRA to "prescribe … procedures … which are consistent with the proposed compact selected by the mediator, the provisions of IGRA, and the relevant provisions of [California law]" and "under which class III gaming may be conducted…." 25 U.S.C. § 2710(d)(7)(B)(vii). Conspicuously absent from that subsection is any requirement that the Secretary, in considering the gaming procedures to be prescribed, consider whether those procedures would violate the Johnson act or "any other applicable federal law." *See* 25 U.S.C. § 2710(d)(7)(B)(iv) (directing the mediator to determine which proposed compact "best comports with [IGRA], and any other applicable Federal law and with the findings and order of the court"). If gaming conducted pursuant to Secretarial Procedures is not treated as synonymous to gaming pursuant to a Tribal-State compact, section 2710(d)(7)(B)(vii) would compel the Secretary to both (1) authorize gaming at least partially inconsistent with the Johnson Act (and completely inconsistent with section 23 of IGRA, codified at 18 U.S.C. §

1166),[8] and (2) not consider whether the gaming is in violation of the Johnson Act (or section 1166).[9]

Next, such a reading would also result in section 2710 also being internally inconsistent in a manner that would render the remedial process inoperative. It is a fundamental cannon of statutory interpretation that "statute[s] should be construed so that effect is given to all [of their] provisions, so that no part will be inoperative or superfluous, void or insignificant...." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction § 46.06, pp. 181–86 (rev. 6th ed. 2000)). Section 2710(d)(1) makes clear that "[c]lass III gaming activities shall be lawful on Indian lands only if such activities are," among other things, "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect." 18 U.S.C. § 1166 mirrors that requirement. If Secretarial Procedures prescribed pursuant to section 2710(d)(7)(A)(vii) are not treated as equivalent to a Tribal-State compact for purposes of IGRA, then the remedial process would be meaningless. Secretarial Procedures could *never* be issued because Secretarial Procedures— necessarily issued in the absence of a compact that is in effect—would *always* be "[in]consistent with … the provisions of [IGRA].…" 25 U.S.C. § 2710(d)(7)(B)(vii)(I). The Court will not read IGRA to have created an empty remedial process. Such an outcome must be rejected.

Even setting aside the internal inconsistencies, a reading of IGRA that treats Secretarial Procedures as a limited remedy, offering fewer class III gaming options than a Tribal-State compact, would wholly undermine the purpose of the remedial process. *See* 25 U.S.C. § 2710(d)(7)(b); S. Rep. 100-446, at *14, reprinted in 1988 U.S.C.C.A.N. 3071, 3085 ("[T]he issue before the Committee was how best to encourage States to deal fairly with tribes as sovereign governments…. The Committee elected, as the least offensive option, to grant tribes the right to

---

[8] Section 23 of IGRA was codified at 18 U.S.C. § 1166(a). It prohibits "gambling" in Indian country to the same extent prohibited elsewhere in a state under that state's law. 18 U.S.C. § 1166(a). 18 U.S.C. § 1166(c) excludes from the definition of "gambling" any "class III gaming conducted under a Tribal-State compact … that is in effect."
[9] If inconsistency with the Johnson Act was the only problem with Plaintiff's proposed reading of the impact of Secretarial Procedures the Court would consider whether IGRA impliedly repealed a portion of the Johnson Act. Because other problems with Plaintiff's proposed reading exist, the Court need not address that question.

sue a State if a compact is not negotiated" in good faith.")[10]; *see Armstrong v. Exceptional Child Center, Inc.*, 135 S.Ct. 1378, 1393 (2015) ("Congress must have intended [section 2710(d)(7)(B)(vii)] to be the exclusive means of enforcing [section] 2710(d)(3)."); *United States v. Spokane Tribe of Indians*, 139 F.3d 1297, 1299-1300 (9th Cir. 1998) (recognizing that the remedial process provides the leverage necessary for Indian tribes to encourage states to negotiate in good faith); *id.* at 1301 ("IGRA … struck a finely-tuned balance between the interests of the states and the tribes. Most likely it would not have been enacted if that balance had tipped conclusively in favor of the states, and without IGRA the states would have no say whatever over Indian gaming.") Without the possibility of Secretarial Procedures authorizing a tribe to conduct class III gaming in the event of a state's failure to negotiate in good faith, no incentive would exist for states to negotiate in good faith. States could do exactly what IGRA sought to prevent—"use the compact requirement … as a justification by a State for excluding Indian tribes from [conducting class III] gaming" in states where such gaming is otherwise legal.[11] S. Rep. 100-446 at *14.

Finally, no court has ever found that class III gaming cannot be conducted pursuant to Secretarial Procedures for want of a Tribal-State compact. In fact, many courts recognize that Secretarial Procedures issued at the final stage of IGRA's remedial process operates as an "alternative mechanism permitted under IGRA" for conducting class III gaming. *Pueblo of Pojoaque v. New Mexico*, 863 F.3d 1226, 1236 (10th Cir. 2017); *accord New Mexico v. Dept. of the Interior*, 854 F.3d 1207, 1224-1225 (10th Cir. 2017); *Big Lagoon Rancheria v. California*, 789 F.3d 947, 955-956 (9th Cir. 2015) ("[O]nce the secretary of the Interior prescribes procedures to govern gaming that are consistent with [the proposed compact selected by the mediator], Big Lagoon Rancheria will be authorized to … engage in the gaming that it seeks.") (citing 25 U.S.C. § 2710(d)(7)(B)(vii)); *Estom Yumeka Maidu Tribe of the Enterprise Rancheria*

---

[10] The Supreme Court made clear in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 72 (1996), that Congress could not constitutionally permit a tribe to force "a recalcitrant state" to the bargaining table through initiation of suit pursuant to IGRA's remedial framework if the state did not consent to suit. *Spokane Tribe*, 139 F.3d at 1299 (citing *Seminole Tribe*, 517 U.S. at 72). That limitation presents no issue here because the State of California did consent to suit. *See North Fork v. California*, 2015 WL 1143826 at *5-6.

[11] Class III gaming pursuant to IGRA can only be authorized in states that permit "such gaming for any purpose by any person, organization or entity." 25 U.S.C. § 2710(d)(1)(B).

13

*of California v. California*, 163 F.Supp.3d 769, 777-778 (E.D. Cal. 2016) (recognizing both that the Secretary of the Interior can prescribe gaming conditions in the final step of the remedial process and that IGRA does not contemplate and does not provide for the conduct of class III gaming in absence of a Tribal-State compact); see *also Texas v. United States*, 497 F.3d 491, 500 (5th Cir. 2007) (characterizing imposition of Secretarial Procedures under section 2710(d)(7)(B)(vii) as "imposition of a compact on an unwilling or uncooperative state").

Stand Up's challenge to issuance of Secretarial Procedures on the ground that such procedures are inconsistent with the Johnson Act is without merit. As to this question, the Secretary's action was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; it was not in excess of statutory jurisdiction or without observance of procedure required by law. Summary judgment on this question will be granted in favor of North Fork and the Federal Defendants.

2. National Environmental Protection Act ("NEPA")

NEPA, codified at 42 U.S.C. § 4321, et seq., "provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *San Diego Navy Broadway Complex Coalition v. United States Dept. of Def.*, 817 F.3d 653, 659 (9th Cir. 2016) (citation omitted). It requires federal agencies to prepare a detailed environmental impact statement ("EIS") for all "major Federal actions affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).[12] "Major Federal action[s]" that trigger NEPA requirements "include[] actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. As a preliminary step, federal agencies prepare an environmental assessment ("EA")—a "concise public document ... [that] [b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact [("FONSI")]." 40 C.F.R. 1508.9; *In Defense of Animals v. Dept. of the Interior,* 751 F.3d 1054, 1068 (9th Cir. 2014) (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir.1998)). When an EA is conducted and a

---

[12] NEPA also requires an EIS to accompany "every recommendation or report on proposals for legislation." 42 U.S.C. § 4332(2)(C). No proposed legislation was at issue here.

FONSI made and explained, an action is not a major Federal action affecting the quality of the human environment and no detailed EIS is required. 40 C.F.R. § 1508.13; *see Concerned Citizens and Retired Miners Coalition v. United States Forest Service*, --- F.Supp.3d ----, 2017 WL 3896290, *32 (D. Ariz. Sept. 6, 2017); *cf. In Defense of Animals*, 751 F.3d at 1068 ("When substantial questions are raised as to whether a proposed project 'may cause significant degradation of some human environmental factor,' an EIS is required.") (citations omitted). It is undisputed that no EA was conducted with respect to issuance of Secretarial Procedures. *See* AR00002186-88. Instead, at this Court's direction, the Secretary issued procedures governing the conduct of class III on the Madera Site, considering only the proposed compact selected by the mediator, the provisions of IGRA, and the relevant provisions of state law. *See* 25 U.S.C. § 2710(d)(7)(B)(vii).

Stand Up argues that (1) the issuance of Secretarial Procedures is a major Federal action for purposes of NEPA, requiring preparation of an EA; and (2) the EIS prepared in connection with taking the Madera Site into trust for North Fork for the purpose of conducting Tribal gaming does not satisfy NEPA's requirement in connection with issuance of Secretarial Procedures. The Secretary and North Fork respond, *inter alia,* that (1) issuance of Secretarial Procedures is not a major Federal action for purposes of NEPA, or (2) even insofar as Secretarial Procedures are major Federal action, the Secretary's authority in issuing gaming procedures is cabined such that the "rule of reason" would excuse preparation of a pointless EIS.[13] The Court agrees with North Fork and the Secretary that the "rule of reason" excludes issuance of Secretarial Procedures from the reach of NEPA's environmental assessment requirement. Accordingly, it only conclusively resolves the second question.

a. Major Federal action

As noted, NEPA obligations are triggered when a federal agency engages in a "major Federal action[] affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

---

[13] The Court reads the "rule of reason" outlined in *Department of Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004) obviate the need for a determination as to whether an agency action was a major Federal action when the agency is not permitted to prevent the action even with the benefit of an EIS. As such, the Court considers whether the issuance of Secretarial Procedures was the cause of the alleged environmental effect and does not decide whether the Secretarial Procedures constitute a major Federal action.

"Major Federal action[s]" that trigger NEPA requirements "include[] actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. Federal actions include approval by a federal agency of projects by non-governmental entities. *Id*. at § 1508.18(b)(4). The Court declines to determine whether prescribing gaming procedures is a major Federal action. *Cf. Jamul Action Committee v. Chaudhuri*, 837 F.3d 958, 963 (9th Cir. 2016) (declining to determine whether the NIGC's approval of a gaming ordinance was a major Federal action where the NIGC was not otherwise not required to comply with NEPA due to an irreconcilable conflict between IGRA and NEPA); *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1225 (9th Cir. 2015) (declining to determine whether an agency action constituted a major Federal action where a statutory mandate limited the agency's authority to act, excusing NEPA compliance).

### b. Rule of Reason

The Supreme Court and NEPA's enabling regulations both make clear that an agency action, regardless of whether it is a major Federal action, is only subject to NEPA environmental assessment obligations if the agency has the authority to prevent the potential environmental effect at issue. *Department of Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004); *see* 15 C.F.R. § 1508.8. "[W]here an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant action, the agency cannot be considered a legally relevant 'cause' of the effect." *Public Citizen*, 541 U.S. at 770; *id.* at 767 ("NEPA requires a 'reasonably close causal relationship' between the environmental effect and the alleged cause.") (citation omitted). This rule has been characterized as a "rule of reason," excusing a federal agency from preparing an EIS "[w]here [its] preparation would serve 'no purpose' in light of NEPA's regulatory scheme…." *Public Citizen*, 541 U.S. at 768.

NEPA was designed with two purposes: First, "'it ensures that the agency, in reaching its decision will have available, and will carefully consider, detailed information regarding significant environmental impacts.'" *Public Citizen*, 541 U.S. at 768 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)); *Jamul Action Committee v. Chaudhuri*, 837 F.3d 958, 961 (9th Cir. 2016). "Second, it 'guarantees that the relevant

information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Public Citizen*, 541 U.S. at 768 (quoting *Robertson*, 490 U.S. at 349.) If preparation of an EIS could serve neither purpose, then an EIS need not be prepared. *Public Citizen*, 541 U.S. at 768. That said, "to the fullest extent possible … public laws of the United States [must] be interpreted and administered in accordance with [NEPA]." *Jamul Action Committee*, 837 F.3d 958, 961 (quoting, *inter alia*, 42 U.S.C. § 4332). If preparation of an EIS might have some impact on the Secretary's prescribing of Secretarial Procedures, the rule of reason would not excuse compliance with NEPA.

The Defendants argue that, even assuming that a full, detailed EIS was prepared, it would not (and indeed it *could not*) have impacted his prescribing of Secretarial Procedures. The remedial process of IGRA does not write the Secretary a blank check to issue any conditions for gaming that he sees fit. Instead, the Secretary and North Fork argue, his view is restricted to consultation with the Indian tribe and review of the compact selected by the mediator, the provisions of IGRA, and the relevant portions of California law. 25 U.S.C. § 2710(d)(7)(B)(vii). The Secretary contends that he is not authorized to modify the procedures from those set in the selected compact except for inconsistency with IGRA or relevant state law. In other words, the Secretary contends that he cannot modify the procedures for environmental reasons.

In response, Stand Up focuses upon the mediator's obligation to select from the two proposed last best offer compacts from the tribe and state, the compact "which best comports with the terms of [IGRA] and any other applicable Federal law and with the findings of the court." 25 U.S.C. § 2710(d)(7)(B)(iv). Although the mediator *selects* the compact, Stand Up argues, it is the Secretary who *gives effect* to it by issuing gaming procedures. Stand Up contends that the Secretary is required to correct any error by the mediator in resolving "any other applicable Federal law," *see* 25 U.S.C. § 2710(d)(7)(B)(iv), rather than "perpetuat[ing] the violation by adopting the mediator-selected compact," Doc. 46 at 25. Stand Up highlights that the Secretary in fact did make changes to the mediatory-selected compact, permitting the State to opt-in to the regulatory role that it takes in relation to tribes with whom it has entered a Tribal-State compact. Doc. 46 at 25; AR00002187-88. "If the State does not opt-in, the National Indian

Gaming Commission [("NIGC")] [will] perform such responsibilities pursuant to a Memorandum of Understanding [("MOU")] with the Tribe." AR00002188; *accord* AR00002245. Plaintiff contends that the modification was not made to comply with IGRA or relevant state law but to comply with "other applicable federal law"—namely the United States Constitution.

Stand Up's proposed reading is again inconsistent with IGRA. First, the Secretary's modification of the mediator-selected compact in a manner designed to avoid offending the Tenth Amendment[14] is not an indication that he is equally bound by NEPA.[15] The text and legislative history of IGRA, as well as subsequent judicial decisions regarding IGRA make clear: a State cannot be compelled to negotiate with an Indian tribe toward entering into a compact or take *any* action gaming-related action with respect to an Indian tribe. 25 U.S.C. §§ 2710(d)(3)(A) (authorizing a Tribe to request negotiations with a State), 2710(d)(7)(B) (establishing a mechanism for authorizing gaming notwithstanding a State's non-participation and framing the State's involvement as a matter of state consent); S. Rep. 100-446 at *13-14 (IGRA is designed to "mak[e] use of existing State regulatory systems" but only "through negotiated compacts" between an Indian tribe and a State.) *Ponca Tribe of Oklahoma v. State of Oklahoma*, 37 F.3d 1422, 1435 (10th Cir.1994) ("Had Congress intended to mandate that the states enter into compacts with Indian tribes, it would not have included these latter sections in § 2710(d)(7)."); *Cheyenne River Sioux Tribe v. South Dakota*., 3 F.3d 273, 281 (8th Cir. 1993) (IGRA gives

---

[14] "'Federal laws conscripting state officers … violate state sovereignty and are thus not in accord with the Constitution.'" *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 620 (2012); (quoting *Printz v. United States*, 521 U.S. 898, 925, 935 (1997); *New York v. United States*, 505 U.S. 144, 176 (1992)). However, Congress "may direct a state to consider implementing a federal program so long as states retain the prerogative to decline Congress' invitation." *Ponca Tribe of Oklahoma v. State of Oklahoma*, 37 F.3d 1422, 1433-1434 (10th Cir.1994); *accord Estom Yumeka Maidu Tribe*, 163 F.Supp.3d at 779.

[15] The Court would note that the Secretary made the same modification when prescribing Secretarial Procedures regarding the Estom Yumeka Maidu Tribe of the Enterprise Rancheria of California in relation to *Estom Yumeka Maidu Tribe of the Enterprise Rancheria of California v. State of California*, 2:14-cv-1939-TLN-CKD (E.D. Cal. 2016). *See* Letter to Glenda Nelson at p. 2, accompanying Secretarial Procedures for the Estom Yumeka Maidu Tribe of the Enterprise Rancheria, located at https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/pdf/idc2-056229.pdf (BIA, Aug. 12, 2016) (last accessed on July 18, 2018). The same modification was also made when prescribing Secretarial Procedures regarding the Rincon Band of Luiseno Indians. *See* Letter to Bo Mazzetti at p.3, accompanying Secretarial Procedures for Rincon Band of Luiseno Indians, located at https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/pdf/idc1-026439.pdf (BIA, Feb. 8, 2013) (last accessed on July 18 2018). Both documents are judicially noticeable.

18

States the "right to get involved in … gaming casino operations within the state…, but does not compel it."); *Estom Yumeka Madiu Tribe*, 163 F.Supp.3d at 779 (IGRA does not require a State "to negotiate with a tribe to conclude a compact, in the sense that there is no ultimate mandate that a [T]ribal-[S]tate [compact] be agreed upon."); *but see New Mexico v. Dept. of the Interior*, 854 F.3d at 1213 ("[S]tates still retain the obligation to negotiate in good faith under § 25 U.S.C. § 2710(d)(3)(A)."). The Secretary made a necessary change to the mediator-selected compact to ensure that Secretarial Procedures complied with the limitations of IGRA, which also had the effect of avoiding violation of the Constitution. The Secretary's modification, in compliance with section 2710(d)(7)(B)(vii), assured that the Secretarial Procedures were "consistent with" IGRA; it was not an attempt to comply with "other applicable federal law." *See* 25 U.S.C. §§ 2710(d)(7)(B)(iv), (vii).[16, 17]

The Court reads section 2710(d)(7)(B)(vii) to contain an exhaustive list of authorities to be considered by the Secretary in prescribing Secretarial Procedures. *See also*, *Texas v. United States*, 497 F.3d at 524 (The Secretarial Provisions issued pursuant to Part 291[18] "differ[] only slightly from the statutory requirement" of section 2710(d)(7)(B)(vii). [I]t is unclear which of the two is more restrictive" but "the regulations certainly do not grant 'unbridled power to prescribe Class III regulations.")  This understanding is consistent with the detailed and comprehensive statutory scheme of IGRA created by Congress. The Secretary, although clearly having the most relevant experience in overseeing Tribal-State compacts, is purposefully removed from the thick

[16] The Court does not now comment on whether the Secretary could (or must) make other changes to a Tribal-State compact that were compelled by the Constitution but not necessary to assure consistency with IGRA or relevant state law. That question is not before the Court.

[17] Even in situations where the Secretary is vested with broader authority by IGRA—to disapprove an agreed upon compact that is inconsistent with IGRA, other provisions of Federal law not related to jurisdiction over gaming on Indian lands, or trust obligations to the Indian tribes, *see* 25 U.S.C. § 2710(d)(8)(B)(i)-(iii)—there is no obligation to comply with NEPA "because there is an irreconcilable statutory conflict between NEPA and IGRA." *Jamul Action Committee*, 837 F.3d at 962 (discussing approval of gaming ordinances by the NIGC pursuant to IGRA).  Indeed, preparing an EIS would be impossible in the 45-day period set by IGRA. *See* 25 U.S.C. § 2710(d)(8)(C); *Jamul Action Committee*, 837 F.3d at 965 (noting that it is impossible for an agency to prepare an EIS in ninety days). From the Court's review, the Secretary has never attempted to complete an EA in response to submission of a Tribal-State compact for approval.

[18] Part 291 of Title 25 of the Code of Federal Regulations was implemented post-*Seminole* to address the situation wherein a state refuses to negotiate or does not negotiate in good faith and then defends a good faith litigation by asserting sovereign immunity. The Tenth Circuit recently held that Part 291 was not a valid exercise of the Secretary of the Interior's authority under IGRA. *New Mexico v. Dept. of the Interior,* 854 F.3d at 1221. This case does not address that situation and that holding has no direct impact here. *See* note 10, *infra*.

of the remedial process. *See Texas v. United States*, 497 F.3d at 500. In this context, the Secretary is required to prescribe procedures consistent with the selected compact, the provision of IGRA, and relevant portions of state law. Elsewhere in IGRA, the Secretary and others with parts in the Congressional scheme are delineated different roles and limitations. *See, e.g.*, 25 U.S.C. §§ 2710(d)(7)(B)(iii) (detailing what a court may consider and must consider in deciding whether a State has negotiated in good faith), 2710(d)(7)(B)(iv) (detailing what the mediator considers in selecting a compact), 2710(d)(8)(B) (detailing the grounds upon which the Secretary may disapprove a compact). In order to give the distinctions in roles meaningful effect, this Court must read section 2710(d)(7)(B)(vii) to list the only considerations that the Secretary is authorized to make. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 (9th Cir. 2017) ("[T]he enumeration of certain criteria to the exclusion of others should be interpreted as an intentional omission.") (citation omitted). Otherwise, the Court would effectively elude the purposeful distinctions made by Congress regarding the roles of the mediator—to select a compact considering, *inter alia*, "other applicable Federal law"—and the Secretary—to give effect to the chosen compact considering, *inter alia*, "provisions of [IGRA]." *See* 25 U.S.C. §§ 2710(d)(7)(B)(iv), (vii); *New Mexico v. Dept. of the Interior*, 854 F.3d at 1225 ("[T]he Secretary's role is limited…. Congress has narrowly circumscribed the Secretary's authority in prescribing procedures by cross-referencing previous steps in the judicial remedial process."); *see also Republic of Ecuador v. Mackay*, 742 F.3d 860, 864 (9th Cir. 2013) ("An interpretation that gives effect to every clause is generally preferable to one that does not.")[19] It is not the Court's province to second guess Congressional judgements. Requiring the Secretary to consider matters outside of those expressly articulated by Congress would do exactly that.

---

[19] Indeed, the Secretary holds trust obligations to the Tribe that are wholly inconsistent with the Secretary being objective in setting aside portions of the mediator-selected compact. *See Texas*, 497 F.3d at 508 (finding that the secretary's trust obligation to an Indian tribe is inconsistent with the Secretary being a neutral party to select a mediator where a state invokes Eleventh Amendment immunity in response to a good faith suit).

Accordingly, in prescribing gaming procedures, the Secretary may only consult with the Tribe, and ensure compliance with the mediator-selected compact, IGRA, and relevant state law. The Secretary could not depart from the mediator-selected compact unless it was necessary to comply with IGRA or relevant state law.

Stand Up's attempt to distinguish this action from *Public Citizen* is unavailing. In *Public Citizen*, the Supreme Court held that the Federal Motor Carrier Safety Administration ("FMCSA") did not need to consider the environmental effects of increased cross-border operations of Mexican motor carriers in the EA because the FMCSA had no ability to prevent those operations. *Public Citizen*, 541 U.S. at 770. A "critical feature" of that case was that the "FMCSA [had] no ability to countermand the President's lifting of the moratorium or otherwise categorically exclude Mexican motor carriers from operating within the United States." The agency had "only limited discretion regarding motor vehicle carrier registration: It must grant registration to all domestic or foreign motor carriers that are willing and able to comply with the applicable safety, fitness, and financial-responsibility requirements.... FMCSA [had] no statutory authority to impose or enforce emissions controls or to establish environmental requirements unrelated to motor carrier safety." *Id*. at 758–59 (internal quotation marks and citation omitted). Because the agency could not prevent the environmental effects, it could not be considered a legally relevant cause of them. *Id*. at 770. In the same way, this Court ordered the Secretary to prescribe gaming procedures—the Secretary could not decline to do so. The Secretary was permitted only limited discretion regarding the content of those procedures. That discretion did not extend to consideration of environmental consequences—certainly not if that consideration meant prescribing procedures inconsistent with the mediator-selected compact. The Secretary could not have considered the results of an EIS in prescribing gaming conditions and cannot be considered a legally relevant cause of any environmental effects. *Public Citizen*, 541 U.S. at 770. The Secretary merely complied with the role and limitations assigned to him by Congress. For that reason, the "rule of reason" excludes compliance with NEPA requirements. *Id*.

The Secretary's action in not conducting an EA or EIS was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; it was not in excess of statutory

jurisdiction or without observance of procedure required by law. The Court will not compel the

Secretary to conduct any review pursuant to NEPA because such review is not required here.

Summary judgment on this question will be granted in favor of North Fork and the Federal

Defendants.[20]

3. Clean Air Act ("CAA")

Distinct from NEPA, the Clean Air Act is concerned with more than process; it creates

substantive requirements and directs the EPA to establish emission limits on air pollutants. 42

U.S.C. § 7409(a); *see* 42 U.S.C. § 7401-7671q. The CAA requires each State to develop a State

Implementation Plan ("SIP"), designed to implement, maintain, and enforce the EPA's national

ambient air quality standards ("NAAQS"). 42 U.S.C. § 7410(a)(1). Each State is divided into air

quality control regions, each of which is designated as a nonattainment area, an attainment area,

or an unclassifiable area depending on the ambient air quality of the area. 42 U.S.C. § 7407(b),

(d). The CAA is concerned primarily with State regulation of "stationary sources"—buildings or

structures which emit or may emit any air pollutant. 42 U.S.C. § 7411(a)(3); *see In re*

*Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 264

F.Supp.3d 1040, 1045 (N.D. Cal. 2017) (citations omitted). Section 176(c)(1) of the CAA, which

applies in nonattainment areas, prohibits federal agencies from "licens[ing]…, permit[ting], or

approv[ing] any activity which does not conform to" a SIP. 42 U.S.C. § 7506(c)(1); *accord* 40

C.F.R. § 93.150(a)-(b). "The assurance of conformity to [a SIP] [is] an affirmative responsibility

of the head of … [an] agency…." *Id.* It is undisputed that the Madera Site is located within the

San Joaquin Valley Air Basin, which is a nonattainment area, triggering the conformity

determination requirement of section 176 of the CAA. Doc. 29-4 at 104. Prior to taking the

Madera Site into trust, the Secretary conducted a conformity determination. Doc. 29-4 at 104-

114; *see Stand Up for California! v. Dept. of Interior*, 2018 WL 385220, *1-2, 9-10. However, it

---

[20] The Court does not reach the question of whether the Secretary was permitted to rely on the EIS prepared in conducting the fee-to-trust determination. The Court would note that, although the gaming procedures prescribed differ from those anticipated in the 2009 EIS, the procedures require North Fork to conduct an environmental assessment prior to construction of a second gaming facility (or a facility different from the facility envisioned in the fee-to-trust process) on the Madera Site. *See* AR00002264. The procedures further require North Fork to enter into an agreement with the County of Madera regarding mitigation of significant environmental impacts. *See* AR00002269-71. In that way, the procedures are wholly consistent with the selected compact. *See* AR00000081-88.

is undisputed that the Secretary did not conduct a conformity determination with respect to the impact of prescribing gaming procedures. Nor did the Secretary did indicate reliance on the previously conducted conformity determination in prescribing gaming procedures.

Stand Up contends the Secretary was required to conduct a conformity determination prior to prescribing gaming procedures and, by failing to do so, the Secretary violated the CAA.

The Secretary and North Fork both contend that, in the same way that the Secretary was unable to consider environmental impacts shown by any EIS, the Secretary could not make changes to the mediator-selected compact in response to the CAA emissions conformity requirements. The Secretary was not delegated "practical control" over the terms of the gaming procedures such that he could impact emissions. Doc. 37 at 44; Doc. 52 at 21; Doc. 51 at 26. Thus, they argue, the Secretary is exempt from conducting a compliance determination because he did not "cause new emissions to exceed" the relevant threshold amounts. *See Public Citizen*, 541 U.S. at 771. The Secretary also argues that his action in prescribing gaming procedures is "a rulemaking or administrative action" that is exempt from the scope of the conformity requirements. Doc. 41 at 36 (citing 40 C.F.R. § 93.153(c)(2)(iii)).

The Court agrees that the Secretary lacks sufficient control over the prescribing of gaming procedures to be able to make modifications based on the requirements of the CAA. As a result, the prescribing of Secretarial Procedures does not require a CAA conformity determination. The Supreme Court explained in *Public Citizen* that "agenc[ies] [are] exempt from general conformity determination[s] under the CAA if [their] action would not cause new emissions to exceed certain threshold emission rates set forth in [section] 93.153(b)." *Public Citizen*, 541 U.S. at 771. Section 93.153 requires agencies to conduct a conformity determination "for each … pollutant … where the total of direct and indirect emissions … in a nonattainment … area caused by a Federal action" would equal or exceed a certain level. 40 C.F.R. 93.153(b). Indirect emissions are those emissions that are "caused or initiated … and originate" in the same nonattainment area as the Federal action but occur at a different time or place as the action, are reasonably foreseeable, that the agency can practically control, and for which the agency has a

continuing program responsibility. 40 C.F.R. § 93.152.[21] Unlike NEPA, the implementing

regulations of the CAA define what it means for a Federal action to "cause" emissions: "[c]aused

by, as used in the term[] … 'indirect emissions,' means emissions that would not otherwise occur

in the absence of the Federal action." 40 C.F.R. § 93.152. "Some sort of 'but for' causation is

sufficient for evaluating causation in the conformity review process." *Public Citizen*, 541 U.S. at

755.

The prescribing of gaming procedures will result in vehicle emissions of ROG and NOx

greater than *de minimus* thresholds and exceeding applicable conformity thresholds during both

construction and operation of the gaming facility. *See* Doc. 29-4 at 111 (finding in the fee-to-

trust CAA conformity determination that vehicle emissions caused by the construction and

operation of the single gaming facility initially envisioned will exceed applicable conformity

thresholds). If the Secretary had not prescribed gaming procedures—as he was required to do—

North Fork could not conduct gaming. The Secretary's prescribing of gaming procedures is

certainly a "but for" cause of class III gaming at the Madera Site. The Supreme Court came to a

similar conclusion in *Public Citizen*. 541 U.S. at 772. It explained that the FMCSA motor carrier

safety and registration regulation regulations—without which no Mexican trucks could enter the

United States (hence they could not emit pollutants in the United States)—was a "but for" cause

of Mexican trucks entering the United States, hence pollution. *Public Citizen*, 541 U.S. at 758,

760, 772.

However, despite being a "but for" cause of pollution, the FMCSA "could not refuse to

register Mexican motor carriers simply on the ground that their trucks would pollute

excessively…, cannot determine whether registered carriers actually will bring trucks into the

United States, cannot control the routes the carriers take, and cannot determine what the trucks

will emit." *Public Citizen*, 541 U.S. at 772-773. The High Court reasoned that the FMCSA did

not "practicably control[]" and would not "maintain control" over vehicle emissions from the

Mexican trucks as would be required to consider the emissions "indirect emissions" which must

---

[21]Direct emissions are those emissions caused by the Federal action that occur at the same time and place as the
Federal action. 40 C.F.R. § 93.152. This case does not involve such emissions. There is no contention that the
prescribing of Secretarial Procedures resulted in a concurrent release of pollutants.

be considered in conformity determinations made pursuant to the CAA. As a result, the FMCSA correctly did not consider any of the "emissions attributable to the increased presence of Mexican trucks within the United States." *Public Citizen*, 541 U.S. at 771, 773. Here, as discussed above, the Secretary's authority to modify the gaming procedures from those selected by the mediator was limited. The Secretary's role was only to ensure that the gaming procedures prescribed were consistent with the mediator-selected compact, IGRA, and relevant California law. 25 U.S.C. § 2710(d)(7)(B)(vii). The Secretary no more practicably controlled or maintained control over emissions at the Madera Site than did the FMCSA in *Public Citizen*.

The Court cannot conclude that the Secretary's decision to not conduct a conformity determination into whether emissions at the proposed gaming site exceed threshold amounts was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; it was not in excess of statutory jurisdiction or without observance of procedure required by law. Summary adjudication will be denied to Stand Up and granted to North Fork and the Secretary.

4. Indian Gaming Regulatory Act ("IGRA")

Stand Up's IGRA challenge is straight-forward: "the Secretarial Procedures are invalid because the Governor of California lacked authority to concur in the Secretary's two-part determination under 25 U.S.C. § 2719(b)(1)(A), and therefore the Madera Site is not eligible for tribal gaming under IGRA." Doc. 29 at 30. The premise that the Governor lacked the authority to concur is not established. That question is now pending before the California Supreme Court.

a. Rule 19

With respect to the same question, this Court and the District of Columbia District Court both found that the State of California is an indispensable party for any claims that "in any way involv[e] the Governor's concurrence." *Stand Up for California*, 204 F.Supp.3d at 254; *Picayune Rancheria of Chukchansi Indians v. United States Department of the Interior*, 2017 WL 3581735, *9-10 (E.D. Cal. Aug. 18, 2017). The same holds true here. Stand Up's cause of action relies upon the invalidity of the Governor's concurrence. At least until the California Supreme Court resolves the question before it, the State of California is an indispensable party.

b. Stay

Stand Up moves to stay this action pending the California Supreme Court's resolution of the gubernatorial concurrence authority question. The parties disagree on the rule to be applied in resolving the question of whether to issue a stay. Stand Up relies on *Landis v. North American Co.*, 299 U.S. 248 (1936) while North Fork and the Federal Defendants argue that *Colorado River Water Conversation District v. United States*, 424 U.S. 800 (1976), controls. This Court has questioned the applicability of *Landis* in governing whether a district court should stay a federal action pending the resolution of a concurrent state court proceeding. *Abrahamson v. Berkley*, 2016 WL 8673060, *19 n. 14 (E.D. Cal. Sept. 2, 2016); *accord Picayune*, 2017 WL 3581735 at *6. Although this Court did not resolve the question and the Ninth Circuit has not spoken directly to the question, the Eleventh Circuit and other district courts in this district have held that the standard articulated in *Colorado River*, governs whether a federal court should stay in favor of a state court proceeding. *See Ambrosia Coal and Const. Co. v. Pages Morales*, 368 F.3d 1320, 1328 (11th Cir. 2004); *Martin v. Minuteman Press Int., Inc.*, 2016 WL 4524885, *2 (E.D. Cal. Aug. 30, 2016) (citing, *inter alia*, *R.R. Street & Co. Inc. v. Transport Ins. Co*, 656 F.3d 996, 975 (9th Cir. 2011)); *see also Colorado River*, 424 U.S. at 817-818 (contrasting the policy of judicial conservation and avoidance of duplicating litigation existing between federal district courts presiding over overlapping actions and the "virtually unflagging obligation of federal courts to exercise jurisdiction" over actions where concurrent state court proceedings exist). For the same reasons articulated by the *Martin v. Minuteman Press* court, this Court concludes that *Colorado River* provides the appropriate standard and that *Landis* is inappropriate to forestall a federal action pending resolution of a parallel state action.

In "exceedingly rare" circumstances, *Colorado River* recognizes a "narrow exception" to the federal courts' "virtually unflagging obligation ... to exercise the jurisdiction given them." *Colorado River Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) ("*Colorado River*"); *Smith*, 418 F.3d at 1033. If "considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," *Colorado River*, 424 U.S. at 817, show that the federal case should defer to the state case, then the federal

court may dismiss or stay the federal action. *See R.R. St. & Co. v. Transp. Ins. Co*., 656 F.3d 966, 978 (9th Cir. 2011). In deciding whether to dismiss or stay a federal case in favor of a state case concerning the same subject matter, courts in the Ninth Circuit are to examine eight factors: (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court. *Id*. at 978–79. With respect to the last factor, although "exact parallelism" is not required between the state and federal cases, "the existence of a substantial doubt as to whether the state proceedings will resolve the federal action precludes *Colorado River* stay or dismissal." *Id*. at 982; *Smith*, 418 F.3d at 1033.

"These factors are to be applied in a pragmatic and flexible way, as part of a balancing process rather than as a mechanical checklist." *Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co*., 843 F.2d 1253, 1257 (9th Cir. 1988). Yet, "[a]ny doubt as to whether a factor exists should be resolved against a stay." *Travelers Indem. Co. v. Madonna*, 914 F.2d 1364, 1369 (9th Cir. 1990).

The Court addresses only the fifth and eighth factors. As to the fifth factor, the "presence of federal-law issues must always be a major consideration weighing against surrender" of jurisdiction, but "the presence of state-law issues may weigh in favor of that surrender" only "in some rare circumstances." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983). This Court resolves Stand Up's IGRA claim on federal procedural grounds; the underlying state law questions do not impact this Court's decision. More importantly, the APA and FOIA claims before this Court will not be completely resolved by the California Supreme Court's decision. *Seneca Ins. Co. v. Strange Land, Inc.*, 862 F.3d 835, 845 (9th Cir. 2017) (The parallelism factor is "more relevant when it counsels against arbitration, because … insufficient parallelism may preclude abstention.") The Court's "virtually unflagging obligation" to resolve those claims compels the Court to move forward with this action.

c. Conclusion

Because a stay is inappropriate pursuant to *Colorado River*, and because the State of California is an indispensable party to this action, Stand Up's IGRA claim will be dismissed for failure to join an indispensable party.

**C. Freedom of Information Act ("FOIA")**

The Freedom of Information Act seeks 'to ensure an informed citizenry, vital to the functioning of a democratic society.'" *Tuffly v. U.S. Dep't of Homeland Sec.*, 870 F.3d 1086, 1092 (9th Cir. 2017) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). Accordingly, "the Act requires that federal agencies make records within their possession promptly available to citizens upon request." *Id*. However, not all records are subject to disclosure; nine exemptions exist. 5 U.S.C. § 552(b).

On August 12, 2016, Stand Up sent a FOIA requests to the Department of the Interior ("DOI") and the Bureau of Indian Affairs ("BIA") requesting "[c]opies of all communications to or from North Fork Rancheria of Mono Indians" and "to or from the State of California" "relating to the development of the Secretarial Procedures." Doc. 29-3 at 5, 8. On August 15, 2016, the BIA informed Stand Up that the FOIA request had been received and "assigned for processing and direct response." Doc. 29-3 at 12. The following day, the DOI responded to Stand Up, indicating that BIA had the information sought and that the BIA would respond directly to Stand Up. Doc. 29-3 at 18. On October 10, 2016, Stand Up sought a status update regarding its FOIA request. Doc. 29-3 at 20. The BIA responded that the FOIA request had been assigned to the Office of the Assistant Secretary – Indian Affairs (ASIA). Doc. 29-3 at 30. On October 6, 2017, the FOIA Coordinator for the Office of the ASIA indicated that the response to Stand Up's FOIA request would be finalized by December 5, 2017. Doc. 52-3 at 1-2.

On December 5, 2017, this Court received notice from the Federal Defendants that on December 4, 2017, the DOI "responded to Stand Up's request, providing all documents answering to the request that are not otherwise subject to withholding under FOIA." Doc. 53 at

2.[22] The documents produced amounted to "about 1,331 pages of documents." Doc. 54 at 2. Two days later, Stand Up responded that the documents provided were apparently incomplete and seeking additional time to review the disclosed documents. Doc. 54. No party has updated the Court on the status of the FOIA dispute since that time. In light of the Federal Defendants' production of documents, and Stand Up's failure to indicate to the Court that the documents provided were in fact an incomplete response, the Court must conclude that the Federal Defendants' response was adequate and all FOIA relief available has been obtained.

### V. Order

Accordingly, IT IS HEREBY ORDERED that:

1. Stand Up for California!'s motion for summary judgment (Doc. 29) is DENIED and Defendants' motions for summary judgment (Docs. 36, 40) are GRANTED, as set out herein;

2. Stand Up for California's motion to stay (Doc. 28) is DENIED; and

3. The Clerk of the Court shall enter judgment and close this case.

IT IS SO ORDERED.

Dated:   July 18, 2018   　　　　　_____

　　　　　　　　　　　　　　　　　SENIOR  DISTRICT  JUDGE

---

[22] The BIA withheld one page under FOIA Exemption 4. Doc. 53-1 at 1 (citing 5 U.S.C. § 552(b)(4) (protecting trade secrets and other privileged or confidential financial information). The BIA withheld a second page under FOIA Exemption 6. Doc. 53-1 at 2 (citing 5 U.S.C. § 552(b)(6) (protecting personnel and medical files). The letter explaining the withheld information also explained that a right exists to appeal the withholding within 90 workdays. Doc. 53-1 at 3.