# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **STAND UP FOR CALIFORNIA!, et al.,** | |
| **Plaintiffs,** | **CASE NO. 2:16-cv-02681-AWI-EPG** |
| **v.** | |
| **UNITED STATES DEPARTMENT OF INTERIOR, et al.,** | **ORDER ON RENEWED CROSS-MOTIONS FOR SUMMARY JUDGMENT, AND PLAINTIFFS' MOTION TO STRIKE** |
| **Defendants,** | |
| **NORTH FORK RANCHERIA OF MONO INDIANS,** | (Doc. Nos. 73, 77, 79 & 84) |
| **Intervenor-Defendant.** | |

Plaintiffs Stand Up for California!, Randall Brannon, Madera Ministerial Association, Susan Stjerne, First Assembly of God – Madera, and Dennis Sylvester ("Stand Up") filed their lawsuit against the United States Department of the Interior and its Bureau of Indian Affairs and the heads of both entities ("Federal Defendants") in an effort to prevent the North Fork Rancheria of Mono Indians of California ("North Fork") from conducting class III gaming operations. The Court permitted North Fork to intervene in this action as a co-defendant.[1] Now before the Court are the parties' renewed cross-motions for summary judgment, which were timely filed after the Ninth Circuit vacated part of this Court's order on summary judgment and remanded for further proceedings. For the following reasons, the Court will grant Defendants' motions and deny Stand Up's.

---

[1] Unless one party is specifically identified, the Court's use of "Defendants" throughout this order refers to Federal Defendants and North Fork collectively.

## BACKGROUND

The North Fork Rancheria of Mono Indians is a federally recognized Indian tribe with a reservation located in Madera County, California.[2]  In 2005, North Fork submitted a fee-to-trust application to the Department of the Interior (the "Department") pursuant to the Indian Reorganization Act.  25 U.S.C. § 5108.  With the application, North Fork sought to have roughly 305 acres in Madera County (the "Madera Parcel") taken into trust for purposes of developing an off-reservation casino and hotel resort.  North Fork later supplemented their application by requesting an exemption from the general prohibition of gaming on newly acquired trust lands under the Indian Gaming Regulatory Act ("IGRA").  25 U.S.C. § 2719(a), (b)(1)(A).  In 2011, the Secretary of the Interior (the "Secretary") granted that exemption by making a two-part determination that a gaming establishment would be in the best interest of the tribe and would not be detrimental to the surrounding community.  AR240–291.  California's governor concurred in that determination.  AR317–318.  Meanwhile, as part of its broader review of North Fork's fee-to-trust application, the Department prepared an environmental impact statement under the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4332(2)(C), and made a conformity determination under the Clean Air Act (the "CAA"), 42 U.S.C. § 7506(c)(1).  AR179–216.  In 2012, the Department agreed to take the Madera Parcel into trust for the tribe.  AR159–227.

A month later, Stand Up and others filed suit in federal court, challenging the Department's fee-to-trust and gaming exemption decisions based, in part, on arguments under NEPA and the CAA.  These arguments were ultimately rejected, and the Department's decisions were upheld.  Stand Up for California! v. U.S. Dep't of the Interior, 204 F. Supp. 3d 212, 323 (D.D.C. 2016), aff'd, 879 F.3d 1177, 1190–92 (D.C. Cir. 2018).

Concurrent to this lawsuit, California enacted a statute that ratified a Tribal-State compact to govern class III gaming activities on the Madera Parcel that was negotiated by the tribe and the governor.  Cal. Gov't Code § 12012.59; AR320–438.  The Secretary later published notice of the

---

[2] The Court incorporates and adopts the recitation of undisputed facts and administrative record citations that was set out in the previous summary judgment order.  Stand Up for California! v. U.S. Dep't of the Interior, 328 F. Supp. 3d 1051, 1056–58 (E.D. Cal. 2018); Doc. No. 58.  A condensed background is provided here for relevant context and to account for subsequent proceedings.

1  compact.  Notice of Tribal-State Class III Gaming Compact taking effect, 78 Fed. Reg. 62,649,

2  (Oct. 22, 2013).  California voters then rejected by referendum the compact-ratifying statute

3  before the underlying agreement could take effect.[3]

4      After the state refused to negotiate a new compact, North Fork commenced an action under

5  IGRA to compel as much.  North Fork Rancheria of Mono Indians of Cal. v. California, No. 1:15-

6  cv-00419-AWI-SAB (E.D. Cal. Mar. 17, 2015).  This Court granted North Fork's motion for

7  judgment on the pleadings and ordered the tribe and the state to conclude a compact within sixty

8  days.  2015 WL 11438206, at *12 (E.D. Cal. Nov. 13, 2015).  Once that deadline passed without

9  an agreement, the Court appointed a mediator who was directed to select a proposed compact from

10 the parties' last best offers.  AR2187.  The mediator selected North Fork's proposal, and later

11 notified the Secretary when California did not consent to this selection.  AR2187.  On July 29,

12 2016, the Secretary—through Lawrence S. Roberts, Acting Assistant Secretary of Indian

13 Affairs—exercised authority under IGRA to prescribe procedures under which class III gaming

14 could be conducted on the Madera Parcel.  AR2189–2325.

15     Stand Up and others then filed this action to challenge these "Secretarial Procedures,"

16 which they claimed violated the Johnson Act, 15 U.S.C. §§ 1171–1178; NEPA, 42 U.S.C.

17 §§ 4321–4370m; the CAA, 42 U.S.C. §§ 7401–7671q; and IGRA, 25 U.S.C. §§ 2701–2721.  Doc.

18 No. 1.  Stand Up also brought a claim under the Freedom of Information Act, 5 U.S.C. § 552.[4]

19
20 [3] As all of this was taking place, Stand Up and others filed suit in California state court, contending that the governor
   violated the California Constitution when he concurred in the Secretary's two-part determination on a gaming
21 exemption under IGRA.  The California Court of Appeal reversed the trial court's dismissal of Stand Up's complaint,
   holding that the governor's concurrence was invalid under state law.  Stand Up for California! v. California, 6 Cal.
22 App. 5th 686, 705 (2016).  That decision was itself abrogated when the California Supreme Court held in a related
   action that the governor has inherent power to concur in gaming exemption determinations.  United Auburn Indian
23 Cmty. of Auburn Rancheria v. Newsom, 10 Cal. 5th 538, 554 (2020).  Thereafter, the California Supreme Court
   vacated the Court of Appeal's decision in Stand Up's case and instructed the lower court to reconsider the matter in
24 light of United Auburn.  Stand Up for California! v. California, 473 P.3d 314, 314–15 (Cal. 2020).  Having done so,
   the Court of Appeal recently determined that the facts of United Auburn were distinguishable and that the California
25 voters' rejection of the compact-ratifying statute for North Fork's gaming operations also constituted an implied
   annulment of the governor's concurrence in the tribe's gaming exemption.  Stand Up for California! v. California, 64
   Cal. App. 5th 197, 215–16 (2021).  Petitions for review of this decision have been filed on behalf of the state and the
26 tribe.  Stand Up for California! v. California, No. S269471 (Cal. June 22, 2021).

27 [4] A separate set of plaintiffs independently challenged the Secretarial Procedures, in part, on allegations that the
   procedures violated IGRA because they were inconsistent with relevant state law.  Club One Casino, Inc. v. U.S.
   Dep't of the Interior, No. 1:16-cv-01908-AWI-EPG (E.D. Cal. Dec. 21, 2016).  This Court rejected that argument and
28 granted summary judgment in favor of the Department.  328 F. Supp. 3d 1033, 1049–50 (E.D. Cal. 2018).  This Court
   also granted summary judgment in favor of the Department in yet another challenge to the procedural validity of the

1  Doc. No. 1.  North Fork intervened and became co-defendants with the Department.  Doc. No. 23.

2  After the Court granted summary judgment to Defendants on all of Stand Up's claims, while also

3  denying Stand Up's summary judgment motion, Stand Up appealed the dismissal of its Johnson

4  Act, NEPA, and CAA claims.  Doc. Nos. 58 & 60.  The Ninth Circuit affirmed summary judgment

5  in Defendants' favor on the Johnson Act claim, and vacated summary judgment on the NEPA and

6  CAA claims and remanded for further summary judgment proceedings.  Stand Up for California!

7  v. U.S. Dep't of the Interior, 959 F.3d 1154 (9th Cir. 2020).  Thereafter, the parties each filed

8  renewed summary judgment motions.  Doc. Nos. 73, 77 & 78.

10  **LEGAL STANDARD**

11  Under the Administrative Procedure Act, a court shall set aside a final agency decision that

12  is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5

13  U.S.C. § 706(2)(A).  When applying this narrow standard of review, a court is not to replace its

14  own judgment for that of the agency.  Fed. Commc'ns Comm. v. Fox Television Stations, Inc.,

15  556 U.S. 502, 513 (2009).  Instead, the court determines whether the agency based its decision on

16  a consideration of the relevant facts and satisfactorily articulated an explanation for its

17  determination.  Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1905

18  (2020); Fox Television Stations, 556 U.S. at 513.  This standard is "highly deferential"—an

19  agency's decision is presumptively valid and shall be affirmed if a reasonable basis exists for the

20  decision.  Kern Cty. Farm Bureau v. Allen, 450 F.3d 1072, 1076 (9th Cir. 2006).  Nonetheless, the

21  court must set aside the agency's decision where "there is no evidence to support the decision

22  or . . . the decision was based on an improper understanding of the law."  Kazarian v. U.S.

23  Citizenship & Immigration Servs., 596 F.3d 1115, 1118 (9th Cir. 2010).

24  Summary judgment is an appropriate mechanism for reviewing an agency decision.  City

25  & County of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997).  The usual

26  "genuine dispute of material fact" standard does not apply.  San Joaquin River Grp. Auth. v. Nat'l

27

28  Secretarial Procedures.  See Picayune Rancheria of Chukchansi Indians v. U.S. Dep't of Interior, No. 1:16-cv-00950-AWI-EPG, 2017 WL 3581735 (E.D. Cal. Aug. 18, 2017).

1  Marine Fisheries Serv., 819 F. Supp. 2d 1077, 1083–84 (E.D. Cal. 2011).  Rather, the court

2  determines "whether or not as a matter of law the evidence in the administrative record permitted

3  the agency to make the decision it did."  San Francisco, 130 F.3d at 877 (quoting Occidental

4  Eng'g Co. v. Immigration & Naturalization Servs., 753 F.2d 766, 770 (9th Cir. 1985)).

5

6                                          **DISCUSSION**

7          The renewed summary judgment motions once again address Stand Up's claims against

8  the Secretary's prescription of Secretarial Procedures based on provisions of NEPA and the CAA.

9  Broadly, Stand Up has alleged that prescribing Secretarial Procedures triggered duties to prepare

10  an environmental impact statement under NEPA and make a conformity determination under the

11  CAA.  Because the Secretary did neither for these Secretarial Procedures, Stand Up contends that

12  both environmental laws were violated here.  Defendants disagree that this pair of statutory duties

13  was triggered under the circumstances of this case.  The Court will turn to Stand Up's claims after

14  first unpacking the statutory nature of Secretarial Procedures.

15

16          **A.      Secretarial Procedures under IGRA**

17          The Indian Gaming Regulatory Act provides "a statutory basis for the operation of gaming

18  by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and

19  strong tribal governments."  25 U.S.C. § 2702(1).  Under IGRA, class III gaming constitutes all

20  forms of gaming that are not class I or class II gaming (as defined by statute), and includes slot

21  machines.  25 U.S.C. § 2703(6)–(8).  Class III gaming operations are lawful on Indian lands "only

22  if such activities are . . . conducted in conformance with a Tribal-State compact entered into by the

23  Indian tribe and the State under paragraph (3) that is in effect."  25 U.S.C. § 2710(d)(1)(C).[5]

24  Given this necessity, IGRA requires states to engage in good-faith negotiations with any qualified

25  tribe that requests to enter a Tribal-State compact.  § 2710(d)(3)(A).  If a district court finds that a

26  _____

27  [5] IGRA also requires class III gaming operations to be authorized by an ordinance or resolution that is adopted by the
    governing body of the tribe and approved by the Chairman of the National Indian Gaming Commission, and located in
28  a state that permits such gaming for any purpose by any person, organization, or entity.  § 2710(d)(1)(A)–(B).  These
    separate requirements are not directly at issue here.

1  state has failed to negotiate a compact or to do so in good faith, the court shall order the tribe and

2  the state to conclude a compact within sixty days.  § 2710(d)(7)(B)(iii).  If an agreement is not

3  then reached, the tribe and the state must each submit a proposed compact to a court-appointed

4  mediator, who in turn must select from the two proposals the one that "best comports with the

5  terms of this chapter and any other applicable Federal law and with the findings and order of the

6  court."  § 2710(d)(7)(B)(iv).  If the state consents to the compact selected by the mediator, "the

7  proposed compact shall be treated as a Tribal-State compact entered into under paragraph (3)."

8  § 2710(d)(7)(B)(vi).  When the state does not consent, however, the "Secretary shall prescribe, in

9  consultation with the Indian tribe, procedures—(I) which are consistent with the proposed

10  compact selected by the mediator . . . , the provisions of this chapter, and the relevant provisions

11  of the laws of the State, and (II) under which class III gaming may be conducted on the Indian

12  lands over which the Indian tribe has jurisdiction."  § 2710(d)(7)(B)(vii).

14  **B.    The NEPA Claim**

15  "NEPA 'is our basic national charter for protection of the environment."  Ctr. for

16  Biological Diversity v. Bernhardt, 982 F.3d 723, 734 (9th Cir. 2020) (quoted source omitted).

17  Congress enacted NEPA to declare a national policy that encourages productive and enjoyable

18  harmony between persons and their environment and promotes efforts to minimize environmental

19  damage through better understanding of the ecological systems and natural resources important to

20  the country.  42 U.S.C. § 4321.  NEPA "does not mandate particular results but simply provides

21  the necessary process to ensure that federal agencies take a hard look at the environmental

22  consequences of their actions."  San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Def.,

23  817 F.3d 653, 659 (9th Cir. 2016).

24  Central to this procedural focus, NEPA requires that agencies prepare an environmental

25  impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the

26  human environment."  42 U.S.C. § 4332(2)(C).  An agency complies with this requirement by

27  creating a detailed statement on the following matters:  (1) the environmental impact of the

28  proposed action, (2) any adverse environmental effects that cannot be avoided should the proposal

be implemented, (3) alternatives to the proposed action, (4) the relationship between local short-term uses of humanity's environment and the maintenance and enhancement of long-term productivity, and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented.  Id.

An EIS is generally created in two stages.  The agency first prepares a draft EIS that examines the scope and environmental consequences of the proposed action.  Ctr. for Biological Diversity, 982 F.3d at 734.  Amidst this examination, the agency must evaluate reasonable alternatives for the proposed action, including a "no action" alternative that provides a baseline against which other viable alternatives can be evaluated.  Id. at 734–35.  If the EIS requirement is the "linchpin" of NEPA, this comparative analysis of alternatives is the "heart" of an EIS.  Id. at 731, 734.  Once the draft EIS is completed, the agency must make "diligent efforts to involve the public" before issuing a final EIS that includes the agency's response to any substantive comments it receives from the public.  Id. at 735.

The parties agree that an EIS was not prepared specifically for the Secretarial Procedures.  This, according to Stand Up, violated NEPA because prescribing Secretarial Procedures under IGRA constituted a major federal action that triggered the EIS requirement.  Defendants disagree.  Defendants also contend that, even if the EIS requirement was triggered, the Secretary can either rely on or supplement the EIS that was prepared by the Department for its review of North Fork's fee-to-trust application.  Stand Up disagrees with each option.

To resolve these disputes, the Court starts with the threshold question of whether prescribing Secretarial Procedures under IGRA constituted a "major Federal action significantly affecting the quality of the human environment."  Sierra Club v. Penfold, 857 F.2d 1307, 1313 (9th Cir. 1988) ("NEPA compliance is required only where there is 'major Federal action' which significantly affects the environment.").  The Ninth Circuit remanded for consideration of this precise question, Stand Up, 959 F.3d at 1165, and all involved agree that it appears to be a novel one.  Not surprisingly, that is also where the agreement ends.  Because an answer to this question is best reached and understood with additional context as to what makes a major federal action under NEPA, the Court will begin there.  The general rubric this context provides can then be

compared to the statutory nature of Secretarial Procedures to see if the EIS requirement did in fact apply here.  From there, the Court will also determine whether, presuming a major federal action occurred, the previously prepared EIS can be given effect in this case.

### 1.   The major federal action question at hand

Although the term "major Federal action" lacks a statutory definition under NEPA, regulations for implementing NPEA both fill that void and include recent revisions that are directly on point for the dispute at hand.  <u>See</u> 40 C.F.R. § 1508.1(q) (2020).[6]  Big picture, the regulations broadly define a major federal action as "an activity or decision subject to Federal control and responsibility."  <u>Id.</u>  This description covers "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals."  § 1508.1(q)(2).  More specifically, the definition instructs that major federal actions tend to fall into one of four categories:

> (1) Adoption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act, 5 U.S.C. [§ ]551 et seq. or other statutes; implementation of treaties and international conventions or agreements, including those implemented pursuant to statute or regulation; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

> (2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which prescribe alternative uses of Federal resources, upon which future agency actions will be based.

> (3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

> (4) Approval of specific projects, such as construction or management activities located in a defined geographic area.  Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities.

---

[6] As explained in this order, revisions to the implementing regulations that are relevant here consist only of renumbering, minor stylistic changes, and express inclusion of legal standards that have long been recognized in case law.  Thus, unless otherwise indicated, the Court cites to the regulations that are codified at 40 C.F.R. pts. 1500–1508 (2020), notwithstanding this version of the regulations becoming effective only after the claims in this case arose.  <u>Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act</u>, 85 Fed. Reg. 43,304, 43,304 (July 16, 2020).

1  § 1508.1(q)(3).

2  The Council on Environmental Quality recently revised the "major Federal action"

3  definition as part of its broader update of the implementing regulations.  See Update to the

4  Regulations Implementing the Procedural Provisions of the National Environmental Policy Act,

5  85 Fed. Reg. 43,304, 43,345–43,350 (July 16, 2020).  In addition to some minor tweaks in the

6  provisions above, the definition now also informs that major federal actions are not, among other

7  things, "[a]ctivities or decisions that are non-discretionary and made in accordance with the

8  agency's statutory authority."  § 1508.1(q)(1)(ii).  Nor are they "[n]on-Federal projects with

9  minimal Federal funding or minimal Federal involvement where the agency does not exercise

10  sufficient control and responsibility over the outcome of the project."  § 1508.1(q)(1)(vi).  The

11  implementing regulations newly recognize these express exclusions amongst the threshold issues

12  that agencies must assess when determining whether NEPA applies.  40 C.F.R. § 1501.1(a)(4),

13  (a)(5).

14  While promulgated after the facts of this case were set, these revisions to the major federal

15  action definition are not revolutionary.  Instead, they simply conform the definition to decades of

16  case law regarding the applicability of NEPA to proposed agency actions.  See Update to the

17  Regulations, 85 Fed. Reg. at 43,347.  For instance, the D.C. and Eighth Circuit Courts of Appeals

18  each considered whether a major federal action occurred when the National Trails System Act

19  required the Surface Transportation Board to issue a certificate of interim trail use that allowed for

20  recreational use of a railroad right-of-way.  Citizens Against Rails-to-Trails v. Surface Transp.

21  Bd., 267 F.3d 1144, 1148–49 (D.C. Cir. 2001); Goos v. I.C.C., 911 F.2d 1283, 1285 (8th Cir.

22  1990).  The relevant statutory provision read in pertinent part as follows:

23
24  If a State, political subdivision, or qualified private organization is prepared to
     assume full responsibility for management of such rights-of-way and for any legal
     liability arising out of such transfer or use, and for the payment of any and all taxes
25  that may be levied or assessed against such rights-of-way, then the Board shall
     impose such terms and conditions as a requirement of any transfer or conveyance
     for interim use in a manner consistent with this chapter, and shall not permit
26  abandonment or discontinuance inconsistent or disruptive of such use.

27  16 U.S.C. § 1247(d).  The courts of appeals concluded that the directive to impose certain terms

28  and conditions meant the agency's performance under the statute was not a major federal action as

1   its role and responsibilities were "essential ministerial." <u>Citizens Against Rails-to-Trails</u>, 267 F.3d

2   at 1152–53; <u>Goos</u>, 911 F.2d at 1295.  Under these circumstances, the court explained, NEPA

3   could not apply because Congress had not granted the agency enough discretion to consider the

4   environmental consequences related to its mandatory action.  <u>See</u> <u>Citizens Against Rails-to-Trails</u>,

5   267 F.3d at 1152–53.

6       The "new" major federal action definition is also supported by Ninth Circuit decisions

7   explaining that nondiscretionary agency actions have traditionally been excused from the

8   operation of NEPA.  <u>Sierra Club v. Babbitt</u>, 65 F.3d 1502, 1512–13 (9th Cir. 1995) (citing, among

9   other cases, the Eight Circuit's decision in <u>Goos</u>).  In <u>Sierra Club</u>, the court held that NEPA did

10  not apply to an agency's approval of a non-federal project for the construction of a logging road

11  pursuant to a reciprocal right-of-way agreement.  <u>Id.</u> at 1506, 1512–13.  Notwithstanding the non-

12  federal actor's complementary agreement to conduct its operations in compliance with "all other

13  applicable State and Federal environmental laws, regulations and standards," the court determined

14  that the agency was without sufficient discretion as it could only modify or halt the project based

15  on three conditions set forth in the right-of-way agreement.  <u>Id.</u>  With the agency's hands being

16  tied in this fashion, the court concluded that NEPA did not apply because the agency could not

17  implement alternatives or otherwise meaningfully influence the underlying project.  <u>Id.</u> at 1513.

18      These examples are not lonely in the federal reporters.  <u>See, e.g.</u>, <u>Nat'l Wildlife Fed'n v.</u>

19  <u>Sec'y of the U.S. Dep't of Transp.</u>, 960 F.3d 872, 880 (6th Cir. 2020); <u>Sac & Fox Nation of Mo. v.</u>

20  <u>Norton</u>, 240 F.3d 1250, 1262 (10th Cir. 2001); <u>Am. Airlines, Inc. v. Dep't of Transp.</u>, 202 F.3d

21  788, 803 (5th Cir. 2000); <u>Sugarloaf Citizens Ass'n v. FERC</u>, 959 F.2d 508, 513 (4th Cir. 1992);

22  <u>NAACP v. Med. Ctr., Inc.</u>, 584 F.2d 619, 633–34 (3d Cir. 1978).  Although this case law and the

23  revised NEPA regulations elevate agency discretion to a lofty position for determining whether an

24  agency action is a major federal action, that outsized role is owed entirely to the aims of NEPA

25  itself.  Congress's intention for NEPA to have sweeping coverage is made clear in the statutory

26  language that agency compliance with the EIS requirement shall be "to the fullest extent possible."

27  42 U.S.C. § 4332.  Yet, NEPA's twin goals of injecting environmental considerations into agency

28  decision-making and informing the public of that deliberative process are greatly diminished, if

not outright defeated, when an agency has no room to act on the information that NEPA provides. San Diego Navy, 817 F.3d at 658 (quoting Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 97 (1983)).  In this sense, and as the examples above make clear, the discretion or lack thereof that dictates whether a major federal action is being contemplated is of a particular kind.  Namely, an agency must have the ability to act or not act based specifically on the environmental information that is discovered through the preparation of an EIS.  Citizens Against Rails-to-Trails, 267 F.3d at 1151.  Without such authority, NEPA's procedural requirements are not implicated because the agency is unable to implement alternatives and otherwise affect the outcome of its actions based on environmental considerations.  Sierra Club, 65 F.3d at 1513.  In other words, no major federal action occurs.  Goos, 911 F.2d at 1295.

### 2.  Prescribing these Secretarial Procedures was not a major federal action under NEPA

Against this backdrop, the Court finds that prescribing Secretarial Procedures under IGRA fits squarely within the traditional exclusion of nondiscretionary agency actions from NEPA for want of a major federal action.  This conclusion is supported not only by the text of the Secretarial Procedures provision itself, but also by the structure and purposes of IGRA more generally. Collectively, these sources show that Congress directed the Secretary to perform a specific duty without authority to meaningfully account for environmental considerations.  Because agency actions of this kind are not major federal actions under NEPA, an EIS was not required and the environmental statute was not violated.

Starting with the relevant statutory text, the Secretary's duty to prescribe Secretarial Procedures under § 2710(d)(7)(B)(vii) is subject to three clear limitations.  First, the Secretary "shall prescribe" the procedures.  Second, the Secretary shall prescribe procedures that are "consistent with the proposed compact selected by the mediator . . . , the provisions of [IGRA], and the relevant provisions of the laws of the State."  Third, the Secretary shall prescribe those procedures such that "class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction."

These textual limitations constrain the Secretary's discretion by requiring certain action based on certain performance and resulting in a certain outcome.  To be sure, the Secretary retains some latitude in so far as the statute lacks point-by-point direction for how procedures are to be prescribed.  And the Secretary also inherently has authority to resolve any conflict that emerges between the mediator-selected compact and applicable law without violating the requirement that procedures shall be consistent with those separate sources.  But this decision-making flexibility does not appear to be of a kind necessary to trigger NEPA—that is, discretionary authority to account for and act on environmental considerations.  To the contrary, the text of § 2710(d)(7)(B)(vii) all but forecloses the Secretary from making ultimate decisions based on environmental considerations.  The Secretary cannot refuse to prescribe procedures on that basis.  Nor can that basis be used to prescribe procedures that fail to allow for class III gaming operations or procedures that vary from, oppose, conflict, or contradict the mediator-selected compact.[7]

At its broadest, the statute can be read to also inherently imply that the Secretary retains enough discretion to ensure the procedures comply with federal law beyond IGRA.  Under this interpretation, the statute effectively provides that procedures must be consistent with the mediator-selected compact, IGRA, relevant state law, *and* other applicable federal law.  In the previous summary judgment ruling, the Court did not recognize this implied portion of the statute and instead concluded that the text of § 2710(d)(7)(B)(vii) contained an exhaustive list of authorities that the Secretary could consider when prescribing procedures.  Stand Up, 328 F. Supp. 3d at 1068–70.  That is, the statute demanded that the "[t]he Secretary could not depart from the mediator-selected compact unless it was necessary to comply with IGRA or relevant state law."  Id. at 1069.  The Ninth Circuit rejected this interpretation as "overly restrictive," explaining that nothing in the statute's terms categorically precluded the Secretary from considering federal law besides IGRA.  Stand Up, 959 F.3d at 1163–64.  Rather, the Ninth Circuit concluded, the Secretary must retain "*some* discretion" to consider applicable federal law so as to be able to avoid a situation that would otherwise cause a federal law violation.  Id. at 1164–65 (emphasis added).

---

[7] Consistent, Merriam-Webster, https://www.merriam-webster.com/dictionary/consistent (last visited August 3, 2021) ("marked by harmony, regularity, or steady continuity : free from variation or contradiction").

1  Conceiving of such a situation, the Ninth Circuit pointed to the pre-procedures requirement for the

2  mediator to "select from the two proposed compacts the one which best comports with [IGRA]

3  and any other applicable federal law."  Id. at 1165 (quoting § 2710(d)(7)(B)(iv)).  As the Ninth

4  Circuit explained, this statutory language only meant that the selected compact would be closer to

5  complying with federal law, not necessarily that it would be consistent with federal law.  Id.  Thus,

6  the court continued, common sense dictated that the Secretary had to have enough authority to be

7  able to prescribe procedures that do not actually violate federal law.  Id.

8       This Court now acknowledges the full extent of the Secretary's authority under the statute.

9  Yet, acknowledging the implied portion of the statute is not the same as determining that it

10  provides the Secretary with enough discretion to create a major federal action.  And doubt builds

11  against that conclusion with a return to the statute's text.  That is, even if the Secretary is not

12  precluded from considering other federal law in prescribing procedures, this additional authority is

13  still subject to the three limitations that are found in the language of § 2710(d)(7)(B)(iv).  When

14  read together, the implied portion of the statute seemingly grants the Secretary with, at most,

15  inherent authority to modify certain provisions in the mediator-selected compact to avoid a federal

16  law violation.  In other words, the same inherent authority the Secretary retains for purposes of

17  resolving conflicts between the mediator-selected compact, IGRA, and relevant state law.  While

18  this certainly qualifies as "some discretion" under the statute, it is not exactly license to implement

19  alternatives or meaningfully influence action based on environmental considerations.[8]  See

20  Citizens Against Rails-to-Trails, 267 F.3d at 1151; Sierra Club, 65 F.3d at 1513.  Moreover, even

21  if the implied requirement is violated because prescribed procedures are inconsistent with federal

22  law, recourse for that violation would be properly sought in a direct challenge to the substance of

23  the procedures.  Such occurred when these procedures were challenged on the comparable ground

24

25  [8] Across the summary judgment proceedings, both sides have pointed to the Secretary's modification of a term in the mediator-selected compact that bound the State of California to take certain regulatory action.  The Secretary altered the term in the procedures such that it no longer imposed an obligation on the state but instead provided an

26  opportunity for the state to opt in to the regulatory responsibilities.  AR2245, 2187–2188.  The Court previously determined that this change only constituted an effort to ensure the procedures were consistent with IGRA.  Stand Up,

27  328 F. Supp. 3d at 1066–67.  Yet, in light of the implied portion of the statute, it could also be said that the change ensured the procedures were consistent with other federal law—namely, the United States Constitution.  See id. at

28  1067 & n.14.  While this example does not conclusively set the boundaries of the Secretary's discretion under the statute, it is illuminating as to the practical reach of that authority.

1  that they were inconsistent with relevant state law.  See Club One, 328 F. Supp. 3d at 1049–50

2  (rejecting that challenge).  In noteworthy contrast, Stand Up has not claimed that the procedures

3  themselves are inconsistent with federal law in making its collateral challenge under NEPA.

4          Turning once again to relevant precedent from other circuits, the Court finds support for

5  this interpretative outcome in other cases holding that NEPA did not apply where an agency

6  performed with limited discretion under a statute.  For instance, the Trails System Act provision at

7  issue in Citizens Against Rails-to-Trails and Goos closely parallels the Secretarial Procedures

8  provision.  Compare 16 U.S.C. § 1247(d), with 25 U.S.C. § 2710(d)(7)(B)(vii).  Each require an

9  agency to do something ("shall prescribe procedures" or "shall impose . . . terms and conditions")

10  for some specific purpose (class III gaming or interim trail use) in a manner consistent with the

11  greater chapter of federal law.[9]  And each impose other parameters for the agency's performance

12  on that statutory requirement:  Secretarial Procedures shall be consistent with the mediator-

13  selected compact, whereas the terms and conditions of a certificate of interim trail use shall be

14  based on the third party's willingness to assume full responsibility for management of the right-of-

15  way, for any legal liability arising out of such transfer or use, and for the payment of any and all

16  taxes that may be levied or assessed against the right-of-way.

17          Unstated but inherent in each statute is also Congress's decision to not preclude the agency

18  from considering other federal law when performing its specific statutory duty.  In other words, in

19  prescribing Secretarial Procedures under IGRA or imposing terms and conditions of interim trail

20  use under the Trails System Act, the agency inherently retains enough authority to consider other

21  federal law to avoid a situation where the result of that agency action would itself violate federal

22  law.  Yet, the existence of this inherent requirement did not prevent the courts in Citizens Against

23  Rails-to-Trails and Goos from concluding that NEPA did not apply because the agency had

24  insufficient discretion to weigh environmental considerations when issuing certificates of interim

25  trail use.  See Citizens Against Rails-to-Trails, 267 F.3d at 1153 ("Section 1247(d) directs the

26  Board to issue a [certificate] subject to terms and conditions imposed by the Board.  It does not

27  _____

28  [9] While the IGRA provision dictates that Secretarial Procedures must also be consistent with relevant state law, this further constrains rather than expands agency discretion.

1  expressly refer to environmental considerations . . . ."); Goos, 911 F.2d at 1296 ("Because the

2  I.C.C. has not been granted any discretion under section 1247(d) to base its issuance of [a

3  certificate] on environmental consequences, we agree that it would make little sense to force the

4  I.C.C. to consider factors which cannot affect its decision to issue [a certificate].").

5      Another apt comparison here is National Wildlife Federation, where the Sixth Circuit

6  considered whether NEPA applied when an agency approved oil risk response plans submitted by

7  operators of oil pipelines under the Clean Water Act.  960 F.3d at 874.  The relevant statutory

8  scheme provided six requirements that operators were to include in their submissions, and stated

9  that the administering agency "shall . . . approve any plan that meets the requirements of this

10  paragraph."  Id. at 874–75 (quoting 33 U.S.C. § 1321(j)(5)(D), (E)(iii)).  In interpreting the statute,

11  the Sixth Circuit explained that "Congress gave the agency specific 'instructions' (the enumerated

12  criteria) and told the agency 'to follow the instructions' ('shall . . . approve')."  Id. at 877 (quoted

13  sources omitted).  The court concluded that the agency's compliance with that obligation did not

14  trigger NEPA because the agency had no ability under the statute to make "free-form

15  environmental decisions."  Id. at 880.  This was the case, the court explained, even if some of the

16  enumerated requirements might have environmental effects and even if the agency's evaluation of

17  those requirements was not "entirely mechanical" and could entail the exercise of some degree of

18  "judgment."  Id. at 876–77, 880 (discussing Nat'l Ass'n of Home Builders v. Defs. of Wildlife,

19  551 U.S. 644, 671 (2007)).

20      While § 2710(d)(7)(B)(vii) may demand slightly more work from an agency, the statute

21  still features the same textual markers that led to the outcome in National Wildlife Federation:

22  that is, certain performance compelled by limiting instructions.  Even if the Secretary is asked to

23  exercise some judgment in prescribing the procedures—noting again that IGRA does not set forth

24  point-by-point directions—that grant of authority is not permission to account for and act on

25  environmental considerations.  In other words, the Secretary does not have authority under the

26  statute "to consider the environment as 'an end in itself.'"  Id. at 880 (quoting Nat'l Ass'n of

27  Home Builders, 551 U.S. at 671).  And like with the Trails System Act example, it could easily be

28  said in the absence of preclusive language in the Clean Water Act that Congress inherently

1    provided the agency with enough discretion to ensure it was not abetting a violation of federal law

2    by approving the contents of a submitted response plan.  The Sixth Circuit did not address this

3    specific possibility, and instead emphasized (as pointed out above) that problems with the contents

4    of an approved response plan should be raised in a direct challenge to the agency's decision and

5    not collateral demands for an EIS.  Id. (cited source omitted).[10]

6          The textual conclusion that prescribing Secretarial Procedures was not meant to involve

7    discretionary weighing of environmental considerations is further supported by the placement of

8    those procedures under § 2710.  IGRA mandates that class III gaming on Indian lands shall be

9    lawful only if it is conducted in conformance with an effective Tribal-State compact.

10   § 2710(d)(1)(C).  Given a compact is necessary, § 2710 sets forth an "elaborate remedial scheme"

11   that ensures tribes have recourse when states prove uncooperative.  Seminole Tribe of Fla. v.

12   Florida, 517 U.S. 44, 50 (1996).  Secretarial Procedures are the final stage of this remedial

13   scheme.  By the time that stage is reached, a court has determined that the state did not negotiate a

14   compact in good faith and the state has refused to consent to a mediator-selected compact that best

15   comports with IGRA, other applicable federal law, and the findings and order of the court.

16   § 2710(d)(7)(B)(i)–(vi).  Once all of this has happened, IGRA requires the Secretary to step in to

17   ensure that class III gaming can occur on the tribe's land by prescribing procedures that substitute

18   for a compact.  § 2710(d)(7)(B)(vii); see also Stand Up, 959 F.3d at 1159–60 (drawing procedures

19   equivalent to a compact); Club One Casino, 328 F. Supp. 3d at 1050 (same).

20         The aim for this greater statutory structure could hardly be more clear.  To guard against

21   the possibility that states might unilaterally obstruct tribes from satisfying an essential requirement

22   for class III gaming, Congress imposed "a complex set of procedures designed to protect tribes

23   from recalcitrant states."  United States v. Spokane Tribe of Indians, 139 F.3d 1297, 1299 (9th Cir.

24   1998).  Secretarial Procedures, in particular, play an indispensable role as the Secretary's authority

25

26   _____

27   [10] This also appears to be the logic of the Ninth Circuit's decision in Sierra Club, as the court there explained that the
non-federal actor's complementary agreement to not violate federal environmental laws provided a remedial
mechanism that the agency could invoke if and when a violation occurred, not a preliminary obligation on the agency
28   to comply with federal environmental laws before acting under the right-of-way agreement.  See 65 F.3d at 1510–11,
1512 (using Endangered Species Act analysis to reach NEPA conclusion).

1   to prescribe procedures as a replacement for a Tribal-State compact provides the teeth for the

2   entire remedial scheme that Congress created.  Club One Casino, 328 F. Supp. 3d at 1050.  Absent

3   such a threat, "the purpose of the remedial process—restoring leverage to tribes to sue recalcitrant

4   states and thereby force them into a compact—would be wholly eroded."  Id.  Nothing about this

5   statutory structure or purpose suggests that Congress meant for the Secretary to play the key role

6   at the final stage of this elaborate remedial scheme by independently accounting for and acting on

7   environmental considerations.

8        Useful here is a comparison to the separate requirement under § 2710 for any negotiated

9   Tribal-State compact to receive approval from the Secretary before it can take effect.

10  § 2710(d)(3)(B), (8)(A).  Under the statute, the Secretary is authorized to disapprove a compact

11  only if it violates IGRA, other federal law, or the United States' trust obligations.

12  § 2710(d)(8)(B).  Where the Secretary does not act within forty-five days, a submitted compact is

13  considered approved (to the extent it is consistent with IGRA).  § 2710(d)(8)(C).  Under Ninth

14  Circuit precedent, the Secretary's action (or inaction) under this portion of the statute does not

15  require an EIS because there is a clear and unavoidable statutory conflict between this narrow

16  window of time to respond and the far greater time that is required to prepare an EIS.  See Jamul

17  Action Comm. v. Chaudhuri, 837 F.3d 958 (9th Cir. 2016) (holding that NEPA did not apply

18  where the National Indian Gaming Commission was required under § 2710(e) to approve a

19  proposed gaming ordinance within ninety days).  In other words, § 2710 expressly authorizes the

20  Secretary to consider federal law beyond IGRA in deciding whether to approve or disapprove a

21  Tribal-State compact, but the Secretary need not be concerned with NEPA in so doing.  The

22  Secretary's approval of a compact is essentially equivalent to the Secretary's prescription of

23  Secretarial Procedures in that each serves as agency certification of the tribe's compliance with the

24  IGRA requirement that class III gaming be conducted in conformance with a Tribal-State

25  compact.  § 2710(d)(1)(C).  Although Congress did not impose a time limit on the prescription of

26  Secretarial Procedures, nothing in the text, structure, or purpose of § 2710 suggests that this choice

27

28

1  was intended to ensure that NEPA applied in one situation but not the other.[11]  To conclude

2  otherwise promotes a rather absurd distinction where the Secretary's authorization of class III

3  gaming operations requires compliance with NEPA solely because of a state's intransigence.

4      Also noteworthy is a comparison with the separate IGRA provision regarding exemptions

5  from the general prohibition of gaming on newly acquired trust lands.  Under this provision, the

6  Secretary must consult with the Indian tribe and appropriate state and local officials (including

7  officials of other nearby Indian tribes) before determining whether a gaming establishment "would

8  be in the best interest of the Indian tribe and its members, and would not be detrimental to the

9  surrounding community."  § 2719(b)(1)(A).  The contrast is clear and compelling.  In making any

10  decision on a possible exemption, the Secretary must give meaning to the incredibly broad

11  statutory language that a gaming establishment "would not be detrimental to the surrounding

12  community."  Moreover, once done, the Secretary has authority to use any information gained

13  through this open-ended inquiry in deciding whether to approve *or deny* the exemption request, as

14  nothing in the statutory language compels a certain result.  In other words, the text of

15  § 2719(b)(1)(A) seemingly authorizes the weighing of environmental considerations as part of the

16  Secretary's decision-making process under the statute.  Applicable Department regulations also

17  suggest as much.  See 25 C.F.R. §§ 292.18, 292.21(a); see also 25 C.F.R. §§ 151.10, 151.11

18  (imposing broad considerations on the Secretary for fee-to-trust determinations).  Section

19  2710(d)(7)(B)(vii) offers no comparable authority.  While the Department's earlier actions cannot

20  necessarily prove that Defendants' argument is correct here, it is worth noting that the Department

21  prepared an EIS for North Fork's fee-to-trust application and gaming exemption request under

22  § 2719(b)(1)(A).  See also Stand Up, 204 F. Supp. 3d at 303–16 (rejecting procedural and

23  substantive challenges to the EIS prepared for the Madera Parcel).

24      On this point, the Court again finds persuasive parallels between this case and the

25  circumstances of Citizens Against Rails-to-Trails and Goos.  In determining that the issuance of a

26  certificate of interim trail use was not a major federal action, both courts of appeals noted the

27

28  [11] The Court also notes that these Secretarial Procedures were prescribed ninety-two days after the Secretary received the mediator's selected compact.  AR2186–87.

18

contrast between that agency action and the earlier agency action of approving the rail carrier's

petition to abandon the relevant part of its railroad line.  267 F.3d at 1153–54; 911 F.2d at 1295.

For abandonment proceedings, the courts explained, NEPA applied based on statutory language

that required the agency to find that "the present or future public convenience and necessity

require or permit the abandonment or discontinuance."  See Goos, 911 F.2d at 1293, 1295

(discussing and quoting 49 U.S.C. § 10903(d)).  To make such a finding, the applicable statute

further instructed the agency to consider whether the abandonment or discontinuance would have

a serious, adverse effect on rural and community development.  § 10903(d).  Both courts

emphasized that the agency's discretion in complying with this statutory duty stood in marked

contrast to its authority under the statute governing interim trail use certificates:

> [I]n an abandonment proceeding the I.C.C. determines whether an abandonment is appropriate by weighing the potential harm to affected shippers and communities against the burden of continued operation of the railroad in interstate commerce. By contrast, under section 1247(d), the I.C.C. *must* issue [a certificate] when a private party files a statement of willingness to assume financial responsibility and the railroad agrees to negotiate.  The statute states that in such circumstances, "the I.C.C. *shall* impose" terms and conditions of transfer, and "shall not permit abandonment."  16 U.S.C. § 1247(d) (emphasis added).  The I.C.C. interprets the section to give it no power to compel a conversion between unwilling parties, and, conversely, no discretion to refuse one if voluntarily negotiated.  Once the parties reach agreement, the I.C.C. suggests that it cannot refuse to permit trail use.

Goos, 911 F.2d at 1295 (cited source and footnote omitted); see also Citizens Against Rails-to-

Trails, 267 F.3d at 1153–54 ("Congress' stated purposes in enacting the Trails [System] Act were

twofold:  to preserve rail corridors for future railroad use and to permit public recreational use of

trails.  Congress used language that focused on those purposes, implicitly leaving environmental

considerations either to environmental assessments accompanying the abandonment proceeding,

the parties' agreement, or other federal or state and local law." (internal citation omitted)).  The

same dynamic is at play here with the contrasting statutory language of the separate IGRA

provisions.  Whereas § 2719(b)(1)(A) requires agency consideration of potential detriment to the

community for purposes of decisions to grant or deny an exemption for gaming on newly acquired

trust lands, § 2710(d)(7)(B)(vii) dictates that the Secretary shall prescribe Secretarial Procedures

that are consistent with the mediator-selected compact and ensure class III gaming can take place

on the tribe's land.

1      Pulling everything together, the Court finds that the text of § 2710(d)(7)(B)(vii) and the

2   greater structure and purpose of relevant IGRA provisions all support a conclusion that prescribing

3   Secretarial Procedures was the Secretary's performance of a ministerial statutory duty, and not a

4   major federal action under NEPA.  This leaves only consideration of Stand Up's counterargument

5   that, discretion or not, NEPA applies to Secretarial Procedures because they are functionally

6   equivalent to a permit.  To start, the Court rejects a conception of the major federal action inquiry

7   that forecloses consideration of agency discretion.  As the case law above shows, it is well

8   recognized that agency actions are not considered major federal actions under NEPA where the

9   agency is without discretionary authority to consider the environment in its decision-making

10   process.  If every agency performance of a statutory duty is treated as functionally equivalent to a

11   permit solely because it stands as a mandatory prerequisite to certain action, the traditional

12   exclusion of these nondiscretionary actions (which is now expressly recognized in NEPA

13   regulations) would be swallowed whole.

14      But even if Stand Up's argument is taken on its own terms, the Court finds it uncompelling

15   given the primary case on which it rests involved agency discretion of a kind that is not present

16   under the circumstances here.  In that case, <u>Ramsey v. Kantor</u>, the Ninth Circuit held that the

17   National Marine Fisheries Service engaged in a major federal action by issuing a statement

18   governing the permissible incidental take of a salmon species listed as threatened under the

19   Endangered Species Act.  96 F.3d at 444–45.  By virtue of the incidental take statement, the states

20   of Washington and Oregon were able to enact regulations permitting salmon fishing in the

21   Columbia River pursuant to a federal-state-tribal compact that controlled fishing allocations and

22   rights of harvest of fish that entered the river system.  <u>Id.</u> at 438–39.  Because the listed species

23   intermingled with and was largely indistinguishable from non-endangered salmon species, it was

24   "all but impossible" to salmon fish in the river without violating the general prohibition of the

25   taking of a protected species.  <u>Id.</u> at 444.  Therefore, the court concluded, this particular incidental

26   take statement was "functionally equivalent to a permit because the activity in question would, for

27   all practical purposes, be prohibited but for the incidental take statement."  <u>Id.</u>  Pointing to case

28   law stating that "if a federal permit is a prerequisite for a project with adverse impact on the

20

1  environment, issuance of that permit does constitute major federal action," the court held that the

2  agency was required to comply with NEPA before it issued the incidental take statement.  Id.

3  (citing Jones v. Gordon, 792 F.2d 921 (9th Cir. 1986), and Port of Astoria v. Hodel, 595 F.2d 467

4  (9th Cir. 1979)).[12]

5       Stand Up draws on the language of Ramsey and argues that the Secretarial Procedures are

6  also "functionally equivalent to a permit" because North Fork could not conduct class III gaming

7  operations without their prescription.  Any appeal this theory facially carries is lost once the

8  statutory scheme that gave rise to the agency action in Ramsey is examined more closely.

9       The Endangered Species Act (the "ESA"), 16 U.S.C. §§ 1531–1544, is administered by the

10  United States Fish and Wildlife Service and the National Marine Fisheries Service under the

11  respective jurisdiction of the Secretary of the Interior and the Secretary of Commerce.  50 C.F.R.

12  § 402.01.  Under the ESA, before engaging in action and barring an exception, a federal agency

13  must consult with the relevant Secretary to ensure that the proposed action is not likely to

14  jeopardize a protected species or adversely modify its critical habitat.  § 1536(a)(2).  After this

15  consultation, the Secretary issues a "biological opinion" detailing how the agency action will

16  affect a species or its habitat.  § 1536(b)(3)(A).  If the Secretary finds that the agency action would

17  place a species in jeopardy or adversely modify its habitat, the Secretary is to describe reasonable

18  and prudent alternatives that can be taken to avoid such an outcome.  Id.  If the Secretary finds that

19  the agency action (or reasonable and prudent alternatives) will not jeopardize the continued

20  existence of a species or adversely modify its habitat but will result in incidental takings of the

21  species, the Secretary shall provide the agency with a written statement that

22       (i) specifies the impact of such incidental taking on the species,

23

24  [12] The Ninth Circuit also determined that the Secretary of Commerce's inaction in the face of a requirement to review
and approve (or disapprove) fishery management plans under the Magnuson-Stevens Fishery Conservation and
Management Act, 16 U.S.C. § 1854, constituted a major federal action under NEPA.  96 F.3d at 444–45.  Because an

25  EIS was not prepared in connection to the separate geographic area to which this statutory obligation applied, the
Ramsey court concluded that a second NEPA violation occurred.  Id. at 445.  Given the Magnuson Act imposed a

26  ninety-five-day deadline for the required agency action, see 16 U.S.C. § 1854(b)(1)(A)–(B) (1994), this holding is
seemingly at odds with other Ninth Circuit decisions indicating that NEPA does not apply where an agency is required
by statute to act without enough time to prepare an EIS.  See Jamul Action Comm., 837 F.3d at 964–66 (9th Cir.

27  2016) (determining that an irreconcilable conflict with NEPA existed because under a separate statute the agency was
required to act within ninety days).  This Court need not delve further into this apparent conflict, as Stand Up does not

28  makes its case based on this portion of the Ramsey decision.

1

2

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

3

(iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

4

5

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

6   § 1536(b)(4); see also 50 C.F.R. § 402.14(i)(1) (indicating that, in addition to the requirements

7   listed under § 1536(b)(4), an incidental take statement shall specify the procedures to be used to

8   handle or dispose of any taken species).  For each of these steps, the ESA requires the Secretary to

9   use the best scientific and commercial data available.  § 1536(a)(2).  Compliance with the terms

10   and conditions of an incidental take statement issued under § 1536(b)(4) provides an exception to

11   the ESA's general prohibition of the taking of a protected species.  § 1536(o)(2); see also

12   § 1538(a)(1)(B)–(C).

13          Based on this statutory language and structure, the ESA inherently authorizes, if not

14   expressly obligates, the Secretary to perform a statutory duty by considering environmental

15   consequences of a specific act.  To determine how the proposed agency action will affect a

16   protected species and its habitat, the Secretary must identify and assess any reasonable, prudent,

17   and available measures that are necessary to avoid violation of the ESA.  With any statement, the

18   Secretary then applies this information by specifying how incidental takings are expected to

19   impact the species and the terms and conditions of measures that shall be implemented to mitigate

20   this impact.  Ramsey itself revealed how this process played out with explanation that the relevant

21   incidental take statement analyzed fisheries and fishing in the Columbia River region and provided

22   details regarding the anticipated harvest limits, the expected catch of endangered fish, and the

23   permissible upper bound for those figures based on later-discovered changes in the run size.  Id. at

24   439, 441 n.12.  This alone suggests what was shown in unpacking the statutory provisions above.

25   The Secretary's issuance of an incidental take statement is the product of a formal evaluation of

26   potential environmental effects that is initiated and developed by the agency itself.  To say that

27   this agency action involves an exercise of discretion that triggers NEPA while the Secretary's

28   prescription of class III gaming procedures consistent with a mediator-selected compact does not,

1   neither betrays the obviously different statutory structures that give rise to these separate duties

2   nor flouts the intentionally broad scope that NEPA carries.[13]

3        In sum, the Secretary's decision to not prepare an EIS for the prescription of Secretarial

4   Procedures was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

5   with law.  Nor was the decision in excess of the Secretary's statutory authority or without

6   observance of procedure required by law.  Rather, NEPA was not triggered and a separate EIS was

7   not required because a major federal action was not considered.  Accordingly, the Court will not

8   compel the Secretary to conduct any further review under NEPA and summary judgment on this

9   issue will be granted in Defendants' favor.

10

11            **2.      If necessary, the Court would grant the Secretary's request for remand**

12                    **to further consider the procedures in light of the prior EIS**

13        The Court is of the opinion that prescribing Secretarial Procedures under IGRA did not

14   constitute a major federal action under NEPA.  Notwithstanding, the Court will still address the

15   parties' dispute regarding whether the EIS that was prepared for North Fork's fee-to-trust

16   application could be used in lieu of preparing a second EIS, if such were necessary.  Stand Up,

17   959 F.3d at 1165–66.  That EIS looked at environmental impacts of the requested trust acquisition

18   and the North Fork's proposed project to develop a casino and hotel resort.  Final Envtl. Impact

19   Statement for the North Fork Rancheria's Proposed 305-Acre Trust Acquisition, 75 Fed. Reg.

20   47,621 (Aug. 6, 2010).  It was also upheld as valid on direct challenge from Stand Up and others.

21   Stand Up, 204 F. Supp. 3d at 302–16.  If this issue is reached, the parties disagree on (1) whether

22   the EIS can be relied on for the Secretarial Procedures; (2) if that is so, whether the record shows

23   that the EIS was actually relied on by the Secretary; and (3) if it does not, whether the proper

24   remedy is to vacate the procedures in full and enjoin all project activities pending compliance with

25   _____

26   [13] It is worth mentioning that Ramsey's holding does not mean that the Fish and Wildlife Service and the National
     Marine Fisheries Service always must prepare an EIS before issuing an incidental take statement.  Ramsey was

27   somewhat unique in that, based on the federal-state-tribal compact, the National Marine Fisheries Service was both
     the consulting agency and the action agency under the ESA.  Generally, this dual role is not the case, and the action
     agency (i.e., the agency seeking to implement the action that requires the incidental take statement) will need to

28   comply with NEPA based on the underlying action itself.  See San Luis & Delta-Mendota Water Auth. v. Jewell, 747
     F.3d 581, 643–45 (9th Cir. 2014).

1  NEPA, or remand to the Secretary for further consideration.

2       Under the NEPA regulations, agencies are instructed to "tier" separate documents of

3  environmental analyses where appropriate, including documents prepared for different stages of

4  actions.  40 C.F.R. § 1501.11.  Along these same lines, the regulations also state that agencies

5  shall prepare a supplement to an EIS whenever a major federal action remains to occur and (1) the

6  agency makes substantial changes to the proposed action that are relevant to environmental

7  concerns, or (2) there are significant new circumstances or information relevant to environmental

8  concerns and bearing on the proposed action or its impacts.  40 C.F.R. § 1502.9(d).  The agency

9  must prepare, publish, and file a supplement as it would do for an original EIS.  § 1502.9(d)(3).[14]

10      The Department has also promulgated its own regulations for the agency's compliance

11  with NEPA.  See 43 C.F.R. §§ 46.10–46.450.  Amongst these, Department actors are instructed to

12  "use existing NEPA analyses for assessing the impacts of a proposed action and any alternatives"

13  and "make the best use of existing NEPA documents by supplementing, tiering to, incorporating

14  by reference, or adopting previous NEPA environmental analyses to avoid redundancy and

15  unnecessary paperwork."  § 46.120(a), (d).  An existing environmental analysis can be used in its

16  entirety if it is determined, "with appropriate supporting documentation, that it adequately assesses

17  the environmental effects of the proposed action and reasonable alternatives.  The supporting

18  record must include an evaluation of whether new circumstances, new information or changes in

19  the action or its impacts not previously analyzed may result in significantly different

20  environmental effects."  § 46.120(c).  When tiering to a broader NEPA document occurs, it must

21  be done with a finding that the conditions and environmental effects described in that document

22  are still valid or address any exceptions.  § 46.140.  Department actors are instructed that

23  "[p]rocedures for adoption or incorporation by reference of [environmental] analyses must be

24  followed where applicable."  § 46.120(a).

25      If the analysis makes it to this point, it can be said that a major federal action remains to

26

27  [14] As with those discussed above, the provisions cited in this paragraph were affected by the recent update of the
    NEPA regulations.  The Court cites the current version of the regulations here for consistency's sake, and notes that
28  these provisions were subject only to renumbering and minor stylistic changes.  Cf. 40 C.F.R. §§ 1502.20, 1502.9(c),
    1508.28 (2019).

24

1   occur.  The parties dispute whether there are substantive differences in the prior EIS and the

2   Secretarial Procedures that represent substantial changes or significant new circumstances relevant

3   to environmental effects.  Superior to this exchange, however, is the absence of an express record

4   regarding the Secretary's determination that use of the prior EIS was permissible under these

5   circumstances.  North Fork contends that the Secretarial Procedures track the prior EIS by

6   pointing out that the procedures expressly reference analysis from the EIS regarding the preferred

7   alternative and mitigation measures that must be implemented if the project expands beyond the

8   scope of that alternative.  The tribe argues that these provisions lead to the common-sense

9   conclusion that the prior EIS was relied on and supplementation was unnecessary.  Although the

10  Court is sympathetic to the tribe's push against "magic words" formalism, the record before the

11  Court does not include the specific documentation required under the Department's NEPA

12  regulations.  Moreover, Defendants' primary position that prescription of the Secretarial

13  Procedures was not a major federal action also suggests that the Secretary did not even consider

14  whether supplementation was required here.  To this point, the Court finds most compelling

15  Federal Defendants' request for the matter to be remanded to the Department for a determination

16  in the first instance of whether the prior EIS can be used in this situation.  Without a showing of

17  bad faith, the Court would grant that request.  See Cal. Communities Against Toxics v. E.P.A.,

18  688 F.3d 989, 992 (9th Cir. 2012).

19          The Court would also do so without vacating the Secretarial Procedures in full or enjoining

20  all project activities.  As discussed in greater detail below, Stand Up's current challenge

21  implicates, at most, a substantive error based on a single term in the Secretarial Procedures

22  regarding the possibility of a second gaming facility on the Madera Parcel.  AR2204.  This

23  possibility, which North Fork insists is not currently being pursued, is conditioned on the tribe

24  having first conducted additional environmental analysis and executed additional agreements with

25  state and county authorities regarding mitigation efforts.  AR2264–2271.  Moreover, the tribe's

26  noncompliance with these requirements can be enforced by the Secretary under the procedures.

27  25 U.S.C. § 2710(d)(7)(A)(iii).  Thus, not only is any possible substantive error isolated, the

28  seriousness of the single error that Stand Up has identified is significantly blunted based on the

1    procedures themselves.  While the failure to follow Department regulations would constitute at

2    least procedural error, North Fork's general operation of class III gaming on the Madera Parcel has

3    been the subject of comprehensive NEPA review, and the direct challenge to that analysis was

4    rejected.  Stand Up, 204 F. Supp. 3d at 302–16.  With all this in mind, vacating the procedures in

5    their entirety would constitute an extreme and overbroad remedy, and the Court believes that

6    equity would demand otherwise.  See Cal. Communities Against Toxics, 688 F.3d at 994.  The

7    same is true regarding the requested injunctive relief, as Stand Up has not established that

8    enjoining *all* project activities would be warranted.  Cf. N. Cheyenne Tribe v. Norton, 503 F.3d

9    836, 843–44 (9th Cir. 2007) (discussing a partial injunction that targeted a specific NEPA failure).

10   Thus, were the Court to conclude that prescribing Secretarial Procedures was an

11   independent major federal action under NEPA (which it does not), the Court would remand to the

12   Secretary for further consideration as to whether the previously prepared EIS can be relied on.

13   And it would do so without vacating the procedures or enjoining all project activities.[15]

14

15   **C.    The CAA Claim**

16   Distinct from NEPA, the Clean Air Act was enacted to promote public health, welfare, and

17   productive capacity by protecting and enhancing the quality of the country's air resources.  42

18   U.S.C. § 7401(b)(1).  To accomplish as much, the CAA depends on a cooperative federalism

19   regime.  Comm. for a Better Arvin v. U.S. Envtl. Protection Agency, 786 F.3d 1169, 1173 (9th

20   Cir. 2015).  Under the CAA, the United States Environmental Protection Agency (the "EPA")

21   establishes national ambient air quality standards and states bear the primary responsibility for

22   assuring compliance with those standards.  § 7401(a)(3); § 7409.  States account for that burden

23   by securing EPA approval of implementation plans that specify how they will achieve and

24   maintain the established standards.  42 U.S.C. § 7410(a)(1).  For purposes of these implementation

25   plans, each state's geographic area is divided into air quality control regions that are designated as

26

27   ───────────────

28   [15] Because the Court would deny the requested injunctive relief on grounds independent of North Fork's alternative arguments against that relief, it would not need to consider Stand Up's motion to strike those arguments.  Doc. No. 84 at 3–4.

nonattainment, attainment, or unclassifiable.  42 U.S.C. § 7407(b), (d).  Generally, nonattainment areas are those that do not meet ambient air quality standards, attainment areas are those that do, and unclassifiable areas are ones without enough information to properly classify as nonattainment or attainment.  § 7407(d).

In nonattainment areas, federal agencies cannot engage in, support, provide financial assistance for, license, permit, or approve any activity that does not "conform" to an approved state implementation plan.  42 U.S.C. § 7506(c)(1).  Conformity, in this context, means:

> (A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and
>
> (B) that such activities will not—
>
>> (i) cause or contribute to any new violation of any standard in any area;
>>
>> (ii) increase the frequency or severity of any existing violation of any standard in any area; or
>>
>> (iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

Id.  To ensure conformity is had, the head of the acting agency has an affirmative duty to make a determination of conformity based on the most recent estimates of emissions.  Id.  On that front, the EPA has promulgated regulations that set permissible rates of emissions and require a conformity determination before any federal action that will cause emissions that equal or exceed those rates.  40 C.F.R. § 93.153(b).

The dispute at hand relies on a simple set of facts and closely tracks the NEPA dispute.  The Madera Parcel is located in the San Joaquin Valley Air Basin, which is a nonattainment area.  A conformity determination was prepared by the Department in 2011 as part of its consideration of North Fork's fee-to-trust application.  This conformity determination was upheld on direct challenge from Stand Up and others.  Stand Up, 204 F. Supp. 3d at 316–323, aff'd, 879 F.3d at 1190–92.  Before prescribing the Secretarial Procedures, the Secretary did not prepare a new conformity determination.  Stand Up argues this constitutes error warranting vacatur of the Secretarial Procedures.  Defendants disagree and argue that the prior conformity determination suffices.  Defendants also object to Stand Up's request for vacatur of the procedures, and assert

that at most the matter should be remanded to the Secretary for further consideration.  The Court will start by examining the prior conformity determination before considering the validity of any subsequent application.[16]

### 1.    The prior conformity determination

During its consideration of North Fork's fee-to-trust application, the Department originally concluded in the final EIS that a conformity determination was not needed because the proposed action would not cause impermissible emissions.  See Stand Up, 204 F. Supp. 3d at 320.  The

---

[16] The Ninth Circuit's ruling on the CAA issue was essentially a summary rejection of this Court's decision based on its analysis of the NEPA issue.  Stand Up, 959 F.3d at 1166.  In its instructions for remand, the Ninth Circuit stated that this Court was "to consider in the first instance whether the conformity determination previously completed during the fee-to-trust process satisfies the CAA's requirements for present purposes."  Id.  The opinion does not state, as it does for the NEPA issue, that this Court should consider other threshold issues including whether the conformity determination requirement was triggered in the first place.  North Fork argues that that question should be considered here.  Given the clear instructions of the Ninth Circuit, this Court will decline that invitation.  In so doing, however, the Court will revisit a possible misstatement of law in its previous summary judgment ruling.

EPA regulations require a conformity determination before any federal action that will cause impermissible rates of direct or indirect emissions.  40 C.F.R. § 93.153(b).  As part of the applicable "federal action" definition, the regulations state that "[w]here the Federal action is a permit, license, or other approval for some aspect of a non-Federal undertaking, the relevant activity is the part, portion, or phase of the non-Federal undertaking that requires the Federal permit, license, or approval."  40 C.F.R. § 93.152.  In other words, the non-federal undertaking stands in the place of the actual federal action of approving that undertaking.  Meanwhile, "direct emissions" are "emissions of a criteria pollutant or its precursors that are caused or initiated by the Federal action and originate in a nonattainment or maintenance area and occur at the same time and place as the action and are reasonably foreseeable."  Id.

In the previous summary judgment ruling, the Court concluded that direct emissions were not involved in this case because no party had contended that prescribing Secretarial Procedures caused a concurrent release of emissions.  Stand Up, 328 F. Supp. 3d at 1071 n.21.  North Fork relies on that statement exclusively for making its argument here.  Yet, the Court now acknowledges that this framing of the direct emissions question appears to be incorrect.  Namely, based on the definitions above, the appropriate framing is whether the non-federal undertaking that required federal approval—that is, North Fork's operation of class III gaming on the Madera Parcel—will cause reasonably foreseeable emissions that occur at the same time and place as that activity.  To instead treat the mere act of prescribing procedures as the relevant activity effectively nullifies the language of the federal action definition under § 93.152.

Admittedly, prior applications of these definitions lend skepticism to whether this interpretation is the correct one.  Compare Dep't of Transp., 541 U.S. at 772 ("[T]he emissions from the Mexican trucks are not 'direct' because they will not occur at the same time or at the same place as the promulgation of the regulations."), and S. Coast Air Quality Mgmt. Dist. v. F.E.R.C., 621 F.3d 1085, 1100 (9th Cir. 2010) (assessing only indirect emissions arising from agency's authorization of a non-federal actor's construction and operation of an expanded natural gas pipeline), with Cal. ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior, 767 F.3d 781, 799 (9th Cir. 2014) (distinguishing between agency decision to change the delivery point of Colorado River water, no direct emissions occurring at the Parker and Imperial Dams, and indirect emissions occurring far from those diversion points), and Determining Conformity of General Federal Actions to State or Federal Implementation Plans, 58 Fed. Reg. 63,214, 63,227 (Nov. 30, 1993) (providing examples based on the definition of "Federal action" that assign responsibility to the agency to review conformity not for the act of issuing a permit, but for the underlying non-federal undertaking).  Because the Court is not further considering North Fork's threshold question here, it need not reach a definitive conclusion on the matter.

28

1   Department then made a conformity determination after the relevant emissions thresholds were

2   lowered when the San Joaquin Valley Air Basin was reclassified as an "extreme nonattainment

3   area." Id.  Because it followed the EIS, the conformity determination piggy-backed on the earlier

4   document, which itself considered the effects of four alternative actions and a no-action

5   alternative.  Id. at 307–08.[17]  For the proposed action ("Alternative A" of the EIS), the conformity

6   determination evaluated expected emissions for both the construction and operation of a casino

7   and hotel resort on the Madera Parcel.  U.S. Dep't of Interior, Bureau of Indian Affairs, Final

8   General Conformity Determination for the North Fork Rancheria Casino/Hotel Resort Project, at 1

9   (June 2011), https://www.northforkeis.com/documents/fcd/Final_Conformity_Determination.pdf.

10  This proposal, which was discussed in far greater detail in the EIS, contemplated North Fork's

11  conducting class III gaming operations pursuant to a Tribal-State compact.  AR165–166; see also

12  U.S. Dep't of Interior, Bureau of Indian Affairs, Final Environmental Impact Statement, North

13  Fork Rancheria of Mono Indians Fee-to-Trust and Casino/Hotel Project, at 2-31 (Feb. 2009),

14  https://www.northforkeis.com/documents/final_eis/files/Section_2.pdf.  The conformity

15  determination explained that construction-related emissions would not exceed permissible

16  emissions rates.  Conformity Determination, at 4.  On the other hand, operation-related emissions

17  ────────────────

18  [17] Stand Up argues that the Court's ability to consider the prior EIS and conformity determination are not possible because those documents were not included in the administrative record.  It further moves to strike portions of North

19  Fork's response to that argument.  Doc. No. 84 at 4.  The Court finds Stand Up's procedural challenge uncompelling.

20  The scope of judicial review of an agency decision is generally limited to the administrative record existing at the time of the agency decision.  San Luis & Delta-Mendota Water Auth., 747 F.3d at 602.  But the record also consists of everything that was before the agency pertaining to the merits of its decision, including all documents and materials

21  directly or indirectly considered by agency decision-makers and evidence contrary to the agency's position.  Goffney v. Becerra, 995 F.3d 737, 747 (9th Cir. 2021).  Given the Secretarial Procedures expressly incorporate the EIS and conformity determination, the Court finds that these documents were at least indirectly considered by the Secretary

22  when the procedures were prescribed.  AR2270–2271.

23  The Court also acknowledges that these documents are publicly available at http://www.northforkeis.com, a website that the Secretary noticed in the Federal Register as hosting the official version of the final EIS.  Final Envtl. Impact

24  Statement for the North Fork Rancheria's Proposed 305-Acre Trust Acquisition, 75 Fed. Reg. 47,621, 47,622 (Aug. 6, 2010); see also Stand Up for California! v. U.S. Dep't of the Interior, 919 F. Supp. 2d 51, 80 (D.D.C. 2013)

25  (explaining that the website "contains all of the relevant documents related to the Secretary's decision to take the Madera Site into trust").  Even though the conformity determination was prepared after this public notice, websites

26  maintained by government agencies are commonly a subject of judicial notice as public records and government documents.  Rollins v. Dignity Health, 338 F. Supp. 3d 1025 (N.D. Cal. 2018) (collecting cases); U.S. ex rel. Modglin

27  v. DJO Glob. Inc., 48 F. Supp. 3d 1362, 1381–82 (C.D. Cal. 2014) (same).  In addition, the Court cited the conformity determination in the previous summary judgment order after Stand Up requested that judicial notice be taken of the

28  document (Doc. No. 29-4 at 104–137).  Stand Up, 328 F. Supp. 3d at 1056; see also id. at 1056 n.3 (citing www.northforkeis.com).

would exceed permissible rates for two pollutants.  Id.  The determination further noted that operational emissions would be "mainly emitted from vehicles visiting the casino/hotel resort, while air emissions from stationary sources are negligible." Id. at 3.  Based on the greater assessment, the conformity determination concluded by noting that North Fork committed to purchase "emissions reduction credits" sufficient to offset emissions associated with the operation of the casino and hotel, and that these credits would be purchased before the opening day of the resort.  Id. at 7; see also Stand Up, 204 F. Supp. 3d at 320–23 (rejecting challenges to conformity determination based on mitigation measures and tribe's commitment).

### 2.    The Secretary's reevaluation of the prior conformity determination was not necessary

Once a conformity determination has been made, it need not be reevaluated if the agency maintains a continuous program to implement the underlying federal action, the determination has not lapsed, or a modification of the action does not result in impermissible emissions.  40 C.F.R. § 93.157(a).

The parties first dispute whether prescribing the Secretarial Procedures was part of a continuous program to implement.  A "continuous program to implement" exists where "the Federal agency has started the action identified in the plan and does not stop the actions [sic] for more than an 18-month period, unless it can demonstrate that such a stoppage was included in the original plan." 40 C.F.R. § 93.152.  Said differently, "[o]ngoing Federal activities at a given site showing continuous progress are not new actions and do not require periodic re-determinations so long as such activities are within the scope of the final conformity determination" that was originally reported.  § 93.157(c); see also Determining Conformity of General Federal Actions to State or Federal Implementation Plans, 58 Fed. Reg. 63,214, 63,239 (Nov. 30, 1993) (clarifying that actions taken subsequent to a conformity determination must be consistent with the basis of that determination).  Also relevant for this inquiry, the applicable "federal action" definition provides that "[w]here the Federal action is a permit, license, or other approval for some aspect of a non-Federal undertaking, the relevant activity is the part, portion, or phase of the non-Federal

1    undertaking that requires the Federal permit, license, or approval."  § 93.152.

2          The fee-to-trust determination, the two-part determination for an exemption from the

3    prohibition of gaming on newly acquired trust lands, and the prescription of Secretarial Procedures

4    each approved some aspect of the same non-federal undertaking—that is, North Fork's operation

5    of class III gaming at a casino and hotel resort located on the Madera Parcel.  In other words,

6    although these separate agency decisions were not made at the same time, for obvious reasons,

7    they all represented the same "relevant activity," and thus the same "federal action," as that term is

8    defined by the CAA regulations.  Put differently once more, there existed a continuous program to

9    implement comprising these ongoing federal activities, each of which was within the scope of the

10   original conformity determination.  And because prescribing Secretarial Procedures was a part of

11   this continuous program to implement, reevaluation of that conformity determination was not

12   required.

13         Stand Up's arguments against this conclusion are uncompelling.  In large part, Stand Up

14   fails to engage the relevant regulations and instead bases its theory that a common federal action

15   did not underlie the fee-to-trust determination, the gaming exemption determination, and the

16   Secretarial Procedures on conclusory statements that these activities are simply qualitatively

17   different.[18]  At its most substantive, Stand Up refers to a definition for "commence" under a

18   separate set of CAA regulations that applies to the construction of a major stationary source.  See

19   40 C.F.R. § 51.166(b)(9).  As Stand Up sees it, based on this definition, a continuous program to

20   implement could exist only after North Fork had obtained all necessary preconstruction approvals

21   or permits and had either begun actual construction or entered a binding construction contract.

22   But nothing in the applicable regulations requires as much, which makes sense given that they

23   broadly apply to federal actions beyond construction projects.  Moreover, the applicable

24   regulations specifically define "start the Federal action"—a phrase found in the definition of

25   _____

26   [18] Stand Up bases much of its counterargument on a cover letter for the copy of the Secretarial Procedures that was
     issued to North Fork, wherein the Secretary noted that "this action to issue procedures is separate from the
27   Departmental decision made years ago requesting the Governor's concurrence to allow gaming on the subject parcel
     as well as the subsequent decision made in 2012 to accept that parcel into trust."  AR2188.  But nothing in the letter
28   (or record) suggests that the Secretary's use of "action" referred specifically to the nuanced definition of "Federal
     action" under the CAA.  Thus, the Court declines to read the seemingly generic reference in such a fashion.

1    "continuous program to implement"—as "the date that the Federal agency signs or approves the

2    permit, license, grant or contract or otherwise physically begins the Federal action."  § 93.152.  In

3    other words, contrary to Stand Up's position, a continuous program to implement can commence

4    with the first act of federal agency approval alone.  The Court finds that to have been the case

5    here.  The Department has been engaged in ongoing activities to ensure North Fork can conduct

6    class III gaming operations on the Madera Parcel at least since the gaming exemption decision was

7    made in 2011.

8        The Court also rejects Stand Up's argument that the prior conformity determination cannot

9    be relied on because it lapsed.  § 93.157(a).  The applicable regulations instruct that a conformity

10    determination "automatically lapses 5 years from the date a final conformity determination is

11    reported under § 93.155, *unless* the Federal action has been completed or *a continuous program to*

12    *implement the Federal action has commenced*."  § 93.157(b) (emphasis added).  Because there

13    was a continuous program to implement, the effect of § 93.157(b) does not apply in this case.  Or

14    as North Fork aptly put it:  "Where an action necessarily takes years to go through the required

15    regulatory approvals, it would be perverse to inject even further delay into the process by requiring

16    the agency to repeatedly rerun the conformity determination."[19]

17        The Court likewise rejects Stand Up's ancillary challenge that the Secretary could not

18    refuse to reevaluate the prior conformity determination because the emission estimation

19    techniques that were used for that determination were out-of-date when the Secretarial Procedures

20    were prescribed.  See 40 C.F.R. § 93.159(b).  The language of § 93.159(b) demands only that

21    conformity determinations are made with use of the latest emission estimation techniques, which

22    necessarily sets the relevant date for compliance at the time a determination is made.  See Stand

23    Up, 879 F.3d at 1191 (rejecting identical challenge).  This interpretation is likewise consistent

24

---

25    [19] Independent of this conclusion, the Court also doubts whether the five-year period even expired in this instance.
      That period is conditioned on the reporting of a final conformity determination under § 93.155.  § 93.157(b).  Stand

26    Up's direct challenge to the prior conformity determination involved a remand to the Department regarding a
      reporting deficiency under § 93.155.  Stand Up for California! v. U.S. Dep't of Interior, No. CV 12-2039 (BAH), 2013

27    WL 12203229, at *2–4 (D.D.C. Dec. 16, 2013).  This in turn caused the conformity determination to not be properly
      reported under § 93.155 until 2014.  Stand Up, 204 F. Supp. 3d at 318–19, aff'd, 879 F.3d at 1190.  In other words,

28    when the Secretary prescribed the Secretarial Procedures on July 29, 2016, the five-year period under § 93.157(b) had
      not yet run.

1 with § 93.157, which does not list the specification of new emission estimation techniques as a

2 condition for reevaluation.

3      The Court is also not persuaded that the Secretarial Procedures modified the federal action

4 (North Fork's class III gaming operations), much less in a manner that would cause impermissible

5 emissions from the modification itself.  § 93.157(a); see also Revisions to the General Conformity

6 Regulations, 75 FR 17,254-01, 17,265 (Apr. 5, 2010) ("[T]he Federal agency does not have to

7 revise its conformity determination unless the modification would result in an increase that equals

8 or exceeded the de minimis emission levels for the area.").  On this front, Stand Up contends that

9 the Secretarial Procedures expand the scope of the gaming operations contemplated in the

10 conformity determination based on the procedures' authorization of 500 more slot machines,

11 unlimited casino floor square footage, and a second gaming facility.

12      The Court is skeptical that a modification exists amongst these three contentions.  Both the

13 Secretarial Procedures and the prior conformity determination (by way of the EIS) contemplated a

14 maximum of 2,500 slot machines.  See AR2203; Final EIS at 2-32.  Although the procedures do

15 not mention a specific casino floor size, they do condition any deviation from the proposed action

16 on North Fork's preparation of a comprehensive tribal environmental impact report and execution

17 of additional agreements with state and county authorities regarding mitigation of any significant

18 environmental impacts.  AR2264–2271.  With such measures in place, the Court finds no reason

19 to read the procedures as actually modifying the proposed action.

20      Stand Up's final contention is its strongest.  Namely, the procedures indicate that North

21 Fork may establish and operate two gaming facilities, while the prior EIS and conformity

22 determination only assessed North Fork's development of one.  AR2204.  But here too the

23 procedures explicitly require the tribe to prepare additional environmental analysis and receive

24 additional local approval before such an expansion in gaming operations can occur.  AR2264–

25 2271.  The Secretary can also enforce noncompliance with these requirements by filing a lawsuit

26 in federal court.  25 U.S.C. § 2510(d)(7)(A)(iii).  In sum, the procedures acknowledge the

27 possibility of a future non-federal undertaking and impose additional guardrails that ensure the

28 environment is accounted for if and when that undertaking is pursued.  Collectively, this

1   arrangement aligns well with the CAA's primary focus of ensuring the federal government does

2   not hinder states' efforts to achieve ambient air quality standards.  It also leaves the Court doubtful

3   that the procedures actually modified the underlying action merely with reference to a second

4   gaming facility.  Adding to that doubt, North Fork has consistently informed this Court that it has

5   no plans to conduct gaming operations larger than the proposed action, which raises another

6   question as to how the Department could reevaluate a conformity determination with no planned

7   modification to assess.  Doc. Nos. 37 at 43 & 79 at 6.

8        But even if the tribe acted on the authorization of a second gaming facility such that an

9   actual modification of the federal action occurred, Stand Up has not pointed to evidence

10   suggesting that the emissions caused by this modification alone would equal or exceed the

11   permissible emissions rates.  In fact, everything points to the opposite conclusion.  That is, the

12   prior conformity determination, which assessed North Fork's operation of both a casino and a

13   hotel, indicated that the resort's construction emissions would be de minimis and that its

14   operational emissions would mainly be emitted from visiting vehicles while emissions from

15   stationary sources (e.g., a gaming facility) would be negligible.  Given this, it stands to reason how

16   North Fork's operation of class III gaming at another stationary source would on its own cause

17   impermissible emissions.  Stand Up offers nothing persuasive on that point.  Thus, even if a

18   modification is presumed, Stand Up has failed to show that the Secretary erred by not reevaluating

19   the conformity determination, much less that any error was even harmful.  See Protect Lake

20   Pleasant, LLC v. Connor, No. CIV 07-PHX-RCB, 2010 WL 5638735, at *42 (D. Ariz. July 30,

21   2010) (citing County of Rockland v. FAA, 335 F. App'x 52, 57 (D.C. Cir. 2009)).

22        As a final matter, Stand Up argues that the Secretary did not indicate reliance on the prior

23   conformity determination when prescribing the Secretarial Procedures.  This is incorrect in so far

24   as the procedures expressly incorporate the final conformity determination.  AR2270–2271.

25   Moreover, as explained above, neither reevaluation nor a new conformity determination was

26   required under the applicable regulations.  Unlike with the Department's NEPA regulations,

27   nothing under the CAA regulations imposes an affirmative obligation on an agency to record that

28   reevaluation or a new conformity determination is not required under the circumstances.  Compare

40 C.F.R. § 93.157(a), <u>with</u> 43 C.F.R. §§ 46.120, 46.140.

Because the Court finds that the Secretary's decision to not reevaluate the prior conformity determination comported with the law and her duties and was otherwise reasonable and within her discretion, the Court will grant summary judgment on this issue in favor of Defendants.[20]

## **<u>ORDER</u>**

Accordingly, IT IS HEREBY ORDERED that:

1. Stand Up's renewed motion for summary judgment (Doc. No. 73) is DENIED;

2. Defendants' renewed motions for summary judgment (Doc. Nos. 77 & 79) are GRANTED;

3. Stand Up's motion to strike (Doc. No. 84) is DENIED as unnecessary; and

4. The Clerk of the Court shall enter judgment and close this case.

IT IS SO ORDERED.

Dated:   August 5, 2021   _____
                                                        SENIOR  DISTRICT  JUDGE

---

[20] Were the Court to find that the Secretary needed to determine whether a new conformity determination was required or otherwise clearly indicate reliance on the previous conformity determination, the Court would remand the matter to the Secretary for further consideration without vacating the Secretarial Procedures.  <u>See</u> <u>Cal. Communities Against Toxics</u>, 688 F.3d at 994.